# UNITED STATES DISTRICT COURT

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM** to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff:_____491 North Mill Road , Kennett Square, PA 19348_____

Address of Defendant:_____3701 Regent Blvd., Irving , TX 75063_____

Place of Accident, Incident or Transaction:_____291 North Mill Road, Kennett Square, PA 19348_____

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))      Yes☐  No☑

Does this case involve multidistrict litigation possibilities?      Yes☐  No☑

*RELATED CASE, IF ANY:*

Case Number: _____Judge _____Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
      Yes☐  No☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
      Yes☐  No☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?      Yes☐  No☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
      Yes☐  No☑

CIVIL: (Place ✓ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations

7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
     (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)

7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☑ All other Diversity Cases
     (Please specify)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, TODD S. COLLINS_____, counsel of record do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☑ Relief other than monetary damages is sought.

DATE: _____7/20/2011_____       **TODD S. COLLINS, ESQ**_____      **PA BAR #**___29405__

                               Attorney-at-Law                           Attorney I.D.#

**NOTE:** A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: _____7/20/2011_____       *Todd S Collins*_____      **PA BAR #**___29405__

                               Attorney-at-Law                           Attorney I.D.#

CIV. 609 (6/08)

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **LISA AND SCOTT CAVE, on behalf of themselves and all others similarly situated,** | No. _____ |
| **Plaintiffs,** | **<u>CLASS ACTION COMPLAINT</u>** |
| **v.** | **<u>JURY TRIAL DEMANDED</u>** |
| **SAXON MORTGAGE SERVICES, INC. and OCWEN LOAN SERVICING, LLC,** | |
| **Defendant.** | |

**TABLE OF CONTENTS**

I.      NATURE OF THE CASE ....................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................................ 3

III.    PARTIES ................................................................................................................. 3

IV.     FACTUAL BACKGROUND .................................................................................... 4

V.      CLASS ALLEGATIONS ....................................................................................... 22

VI.     CAUSES OF ACTION .......................................................................................... 26

COUNT I – BREACH OF CONTRACT / BREACH OF DUTY OF GOOD FAITH AND FAIR
        DEALING ............................................................................................................ 26

COUNT II – PROMISSORY ESTOPPEL ................................................................... 28

COUNT III – VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES
        AND CONSUMER PROTECTION LAW, 73 P.S. § 201-2(xxi) ............................ 29

COUNT III – VIOLATION OF PENNSYLVANIA FAIR CREDIT UNIFORMITY ACT ....... 30

COUNT IV - VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT ............ 31

VII.    PRAYER FOR RELIEF ......................................................................................... 32

VIII.   JURY TRIAL DEMANDED ................................................................................... 33

## I.     NATURE OF THE CASE

1.     Plaintiffs Lisa and Scott Cave bring this action on behalf of themselves and all similarly situated Pennsylvania homeowners who have been wrongfully denied a permanent modification of their mortgages by Saxon Mortgage Services, Inc. ("Saxon") and/or Ocwen Loan Servicing, LLC ("Ocwen"), (collectively, "Defendants").   Defendants entered into standardized written temporary loan modification contracts ("TPP Contracts," as defined below) with certain borrowers whom Defendants presumably pre-qualified for loan modifications under the U.S. Department of the Treasury's Home Affordable Modification Program ("HAMP").   These TPP Contracts promised that, if borrowers made the reduced monthly loan payments set forth in the contract for a trial period of three months and submitted the requested documentation, then their loans would be permanently modified in the fourth month and, thereafter, they would need to pay only the reduced amount.   Even though the borrowers lived up to their end of the bargain and fulfilled all of their obligations under their respective TPP Contracts, Defendants breached their contractual obligations by failing to modify on a permanent basis these borrowers' loans.

2.     The classes represented here (collectively, the "Class") consist of:

a.   All Pennsylvania homeowners whose mortgage loans have been serviced by Defendants and who, since April 13, 2009, (i) have entered into a TPP Contract with Defendants and made all payments as required by their TPP Contract and complied with Defendants' requests for documentation, and (ii) have not received a permanent Home Affordable Modification and did not receive a timely written notification to borrower explaining the reason for denying the permanent modification (the "Denied Class").

b.   All Pennsylvania homeowners whose mortgage loans have been serviced by Defendants and who, since April 13, 2009, (i) have entered into a TPP Contract with Defendants and made all payments as required by their TPP Contract and complied with Defendants' requests for documentation, (ii) but were improperly reported to credit reporting agencies as delinquent ("Credit Reporting Class").

c.   All Pennsylvania homeowners whose mortgage loans have been serviced by Defendants and who, since April 13, 2009, (i) have entered into a TPP

Contract with Defendants and made all payments as required by their TPP Contract and complied with Defendants' requests for documentation, (ii) but were improperly placed in foreclosure and/or charged for various foreclosure-related fees ("Foreclosure Class").

3.     Defendants have engaged in a shocking array of unfair, deceptive, and misleading practices and breaches of duty.  Defendants have strung along Plaintiffs and Class members, repeatedly requesting documentation already provided, and promising a permanent loan modification that Defendants apparently never intended to grant and, in any event, never granted. While leading on Plaintiffs and Class members with the promise of a permanent loan modification, Defendants continued to demand and accept monthly mortgage payments, under the false premise that these payments supported mortgagors' efforts to obtain a modification, and to avoid active foreclosure proceedings.  Had Plaintiffs and Class members been aware that Defendants never intended to modify their loans as promised, they would have forgone the entire modification process.

4.     Among other things, Defendants, in bad faith, have instructed mortgagors to stop making mortgage payments under the false pretense that doing so will not hurt credit scores and is necessary for them to qualify for a loan modification; have failed  to properly and timely evaluate borrowers' eligibility for a permanent loan modification in accordance with HAMP guidelines; have failed to grant promised permanent HAMP loan modifications following mortgagors' successful completion of TPP Contract plans; have misrepresented the status of loan modification applications; have requested the same financial information over and over; have erected artificial obstacles in the evaluation process to obstruct, delay, and/or prevent permanent loan modifications; have failed to keep accurate records of mortgagor accounts, including accounting for fees, payments, credits, arrearages, and amounts owed; have failed to keep accurate records of HAMP applicants' scores on standard Net Present Value ("NPV") tests; have

failed to provide account information requested by mortgagors; have failed to provide adequate explanations of fees charged to mortgagors; have charged excessive, unlawful, and unreasonable fees; have arbitrarily increased mortgagor debt obligations; have failed to apply mortgagor payments properly; have caused improper interest and other fees to accrue; have flagrantly breached TPP Contracts; and have unlawfully proceeded with foreclosures despite mortgagors' compliance with their TPP Contract obligations.

## II.     JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332(d), because this action is between citizens of different states, a class action has been pled, and the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

6.      Venue is proper in this District under 28 U.S.C. §1391.  Defendants do substantial business in this Commonwealth and within the Eastern District of Pennsylvania, receive substantial compensation and profits from the servicing of home mortgage loans in this District, and have made material omissions and misrepresentations and breached contracts and other promises and engaged in unlawful practices in this District, so as to subject themselves to personal jurisdiction in this District.  Plaintiffs reside in this District, and Plaintiffs' property is located in this District.

7.      This Court has personal jurisdiction over Defendants to this action because Defendants do substantial business in this Commonwealth, and a substantial portion of the wrongdoing alleged took place in this District.

## III.    PARTIES

8.      Plaintiffs Lisa and Scott Cave reside in Kennett Square, Pennsylvania.  Their home mortgage loan was originally held and serviced by Saxon, and, on information and belief, was transferred to Ocwen in May 2011.

3

9.      Defendant Saxon, a subsidiary of Morgan Stanley, is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities.  Defendant Saxon maintains its principal place of business at 3701 Regent Boulevard, Irving, Texas 75063.

10.     Defendant Ocwen, a subsidiary of Ocwen Financial Corporation, is a mortgage bank and home mortgage loan servicer, servicing mortgages on behalf of lenders and investors, including pooled mortgage-backed securities.  Defendant Ocwen maintains its principal place of business at 1661 Worthington Road, Suite 100, West Palm Beach, Florida 33409.

11.     As of May 16, 2011, the servicing of Plaintiffs' mortgage was transferred from Saxon to Ocwen, together with all rights, title, interests and obligations arising under Saxon's contracts with Plaintiffs, including but not limited to the TPP Contract that Saxon entered into with Plaintiffs.

## IV.    FACTUAL BACKGROUND

### A.      Mortgage Loan Servicers Profit from Delayed Loan Modifications.

12.     The United States housing market has been and continues to be in crisis.  A Congressional panel in 2009 noted that one in eight U.S. mortgages was then in foreclosure or default.   Press Release, Congressional Oversight Panel (Oct. 9, 2009) (available at http://cop.senate.gov/press/releases/release-100909-foreclosure.cfm).   In 2010, owners of a record 2.9 million homes, or one out of every 45 homes, suffered a foreclosure filing.

13.     Pennsylvania homeowners have suffered greatly.  The Associated Press reported on September 16, 2010:

> The number of Pennsylvania homeowners falling behind on mortgage payments and the number of homes seized by banks hit five-year highs in August.
>
> New figures out Thursday from foreclosure listing firm RealtyTrac Inc. showed 6,500 Pennsylvania homes received at least one foreclosure filing in August, while banks

4

repossessed 2,300 properties.

Both numbers are the highest recorded by RealtyTrac since it began tracking them in
2005. Pennsylvania now has seen those numbers spike in August for three straight years.

(http://www.pennlive.com/midstate/index.ssf/2010/09/pennsylvania_home_foreclosure.html).

14.     According to *Realtytrac*, with respect to foreclosures, Pennsylvania ranked 17th

highest among the States for February 2011, with 3,110 foreclosure properties, representing one

in every 1,774 housing units. (http://www.realtytrac.com/trendcenter/.)

15.     Recently, all 50 state attorneys general and numerous federal agencies have joined

forces in an investigation into the foreclosure practices of mortgage loan servicers such as

Defendants.  This reflects the realization that mortgage loan servicers have taken advantage of

struggling homeowners to boost their profits.  As one expert explained: the "core problem" is

"servicers' failure to service loans, account for payments, limit fees to reasonable and necessary

ones, and provide loan modifications where appropriate and necessary to restore loans to

performing status."  *Problems in Mortgage Servicing From Modification to Foreclosure:*

*Hearing Before the S. Comm. on Banking, Housing and Urban Affairs,* 111th Cong., at 3 (Nov.

16, 2010) (written testimony of Diane E. Thompson, National Consumer Law Center)

[hereinafter, "Thompson Testimony"].

16.     In February 2009, the Secretary of the Treasury and the Director of the Federal

Housing Finance Agency announced the Making Home Affordable ("MHA") program.  In an

effort to stem the foreclosure crisis, and as part of the MHA, HAMP was created.  HAMP

"lowers [mortgagors'] monthly payment[s] to 31 percent of [their] verified monthly gross (pre-

tax) income to make [their] payments more affordable." (Home Affordable Modification

Program, .)  HAMP has been increasingly used by servicers since 2009.

17.     Unfortunately, HAMP has been abused by servicers such as Defendants.  *See* Olga Pierce & Paul Kiel, ProPublica, *By the Numbers: A Revealing Look at the Mortgage Mod Meltdown,*   Mar.   8,   2011   [hereinafter   "*Meltdown*"]   (available   at http://www.propublica.org/article/by-the-numbers-a-revealing-look-at-the-mortgage-mod-meltdown#chances).  The "average rate of [mortgage] modifications in the past two years is not significantly different than the rate before HAMP launched."  *Id.*  Since HAMP was launched in April 2009, applicants have waited many months for modifications – well beyond the three months contemplated under the program.  *Id.*

18.     Since HAMP's inception through November 2010, the number of trial modifications cancelled by participating servicers such as Defendants has vastly exceeded the number of conversions to permanent modifications.  During this period, of approximately 1.4 million trial modifications started, roughly 729,000 were cancelled and only about 550,000 trials were converted to permanent modifications.  "Troubled Asset Relief Program: Status of Programs and Implementation of GAO Recommendations," Jan. 12, 2011, GAO-11074, at 35.

19.     Central to the failure of HAMP is a pattern of arbitrary and inequitable actions by servicers, the purpose and effect of which has been to prevent modifications from proceeding to completion.   According to ProPublica, most of the canceled TPP trial modifications have occurred "despite the fact that the homeowner had made all of the payments." *Meltdown*.  And in nearly one-quarter of modification rejections, servicers cited "missing" or "incomplete" documents as the reason for the denial. *Id.* (analyzing Treasury Department data).  ProPublica estimates that almost half a million homeowners may have been rejected because of "lost" documents.

20.     Foremost among mortgage loan servicer abuses is the servicers' failure to provide eligible borrowers with permanent loan modifications. Thompson Testimony at 3.   Servicers often overstate restrictions imposed by the investors in mortgage-backed securities when denying modifications, thereby harming both the mortgagor and the investor, while the servicers increase their income.   *Id.* at 8.   Indeed, "modifications, short sales and deeds in lieu" are "generally better outcomes for both homeowners and investors" than foreclosures.   *Meltdown.*

21.     Servicers have repeatedly offered temporary "repayment plans" in lieu of permanent modifications.  Interminable repayment plans harm homeowners who are left with no finality and no permanent modification of the terms of their mortgages.

22.     Servicers delay and obstruct mortgagors, forcing them to submit the same paperwork repeatedly, returning or refusing to accept payments, and otherwise thwarting mortgagors' sincere efforts to obtain permanent modifications.  Thompson Testimony at 9-13 (describing examples of how servicers drag out the mortgage modification process).

23.     The objective of these tactics is to profit at the expense of distressed homeowners. Upon foreclosure, servicer profits soar from foreclosure-related fees accrued during protracted modification processes.  This is because servicers get to take the accrued fees—including fees for property inspections, purported attorney's fees and costs, and late fees, among others—off the top of the foreclosure proceeds. *Id.* at 19-36.

24.     Foreclosure is often the result after a long modification application process, a process that servicers strive to stretch out, "without either a modification or a foreclosure," maximizing their fees. *Id.* at 21.

25.      Defendants and other servicers benefit in a variety of ways if they avoid permanent loan modifications, including the following:

a.     Defendants may be required to repurchase loans from the investor in order to permanently modify the loan, which entails substantial cost and loss of revenue for servicers.  This can be avoided by keeping the loan in a state of temporary modification or lingering default.

b.     The monthly service fee that Defendants, as servicer, collect for each loan they service in a pool of loans is calculated as a fixed percentage of the unpaid principal balance of the loans in the pool. Consequently, modifying a loan reduces the unpaid principal balance of the pool and thus lowers the servicer's monthly fee.

c.     Fees that Defendants charge borrowers that are in default constitute a significant source of revenue to Defendants. Late fees and "process management fees" are often added to the principal loan amount, thereby increasing the unpaid balance in the pool of loans and adding to the servicer's monthly service fee.

d.     Entering into a permanent modification will often delay a servicer's ability to recover advances it is required to make to investors with respect to unpaid principal and interest on a non-performing loan. The servicer often recovers less by way of expenses from an investor in a loan modification, as opposed to a foreclosure.

e.     A servicer who performs loan modifications incurs increased fixed or overhead expenses, including up-front cost for additional staffing, physical infrastructure, property valuation, credit reports and financing costs.

26.      As of July 2009, Saxon had modified just 6% of the mortgages it serviced that originated between 2005 and 2007, according to a July 16, 2009 article in The Wall Street Journal, "Mortgage Firms Struggle to Redo Hard-Hit Loans."  This article describes how Saxon was completely unprepared to deal with the flood of modification requests it received after HAMP began, and lacked staff with training and experience in modifying loans.  This article also notes that "Saxon didn't ramp up its ability to modify loans as early as other servicing companies."  By May 2010, little had changed.  Specifically, an article in ProPublica, "No Penalties for Mortgage Company with Worst Loan Mod Backlog," reported that "[o]f all the mortgage companies participating in the administration's mortgage modification program, Saxon has the largest proportion of homeowners caught in modification limbo."  As of April 2010,

"Saxon had put 40,000 homeowners into trials, but only about 11,000, or 27 percent, had received a permanent modification. Far more had either been dropped from the program (16,000) or were still waiting for a final answer after being in the trial for longer than six months (10,000)." *Id.* According to Treasury Department data through January 30, 2011, Saxon had offered 37,495 trial modifications, but cancelled trials of 21,673 borrowers, or 57.8 percent, and offered permanent modifications to only 12,931 borrowers, or 34.5 percent.

27.     Defendant Ocwen also has a spotty record for HAMP modifications. For instance, a January 19, 2010 ProPublica article, "Logjam Continues for Loan Mods; Big Banks Fare Poorly, Data Show" reported that Ocwen had placed only about 20 percent of its eligible homeowners into HAMP trials, and funneled many more of its customers into so-called "in-house modifications," which provide terms that are substantially less favorable to the borrower than modifications under HAMP.

**B.     Defendants' Participation in HAMP**

28.     Saxon executed a Servicer Participation Agreement (together with the March 24 amendment, identified below, the "SPA") with the federal government on or about April 13, 2009. *See* Commitment to Purchase Financial Instrument and Servicer Participation Agreement for the Home Affordable Modification Program under the Emergency Economic Stabilization Act of 2008; *see also* Amended and Restated Commitment to Purchase Financial Instrument and Servicer Participation Agreement, executed on March 24, 2010. By entering into the SPA, Saxon covenanted that it would perform all services in compliance with all applicable federal, state, and local laws, specifically including state laws designed to prevent unfair, discriminatory, or predatory lending practices. Saxon also covenanted that it would perform services in accordance with the "practices, high professional standards of care, and degree of attention used in a well-managed operation, and no less than that which the Servicer exercises for itself under

9

similar circumstances," as well as "use qualified individuals with suitable training, education, experience and skills to perform" services.

29.     Ocwen executed a SPA with the Treasury Department on April 16, 2009, which Plaintiffs incorporate herein by reference.   The terms of the SPA executed by Ocwen are substantially identical to the terms of the SPA executed by Saxon.

30.     The SPA requires a participating servicer to follow all guidelines, procedures, and directives issued as part of HAMP.  According to the first supplemental directive (the "SD") issued under HAMP, participating servicers must "use a uniform loan modification process to provide a borrower with sustainable monthly payments."  Home Affordable Modification Program, Supplemental Directive 09-01, 4/6/2009, SD 09-01, at 1 [hereinafter, "HAMP SD"]. *See also* MAKING HOME AFFORDABLE PROGRAM, HANDBOOK FOR SERVICERS OF NON-GSE MORTGAGES 11 (ver. 3.0, Dec. 2010) [hereinafter, "MHA HANDBOOK"].

31.     As participating servicers, Defendants are required to evaluate all loans that are 60 or more days delinquent or appear to be at risk of imminent default in order to determine which loans meet the HAMP eligibility criteria.  HAMP SD 09-01 at 4.  Defendants are also required to consider a HAMP modification if, after receiving hardship information from a borrower, "the servicer concludes a current borrower is in danger of imminent default . . . ." *Id.* at 13.  Next, Defendants are required by HAMP to determine the borrower's eligibility for a modification based on either "recent verbal financial information obtained from the borrower" or the borrower's submission of "the required documentation to verify the borrower's eligibility and income…" *Id.* at 5.

32.     After obtaining the borrower's financial information, Defendants are required to calculate whether, by applying certain successive steps known as the "waterfall," in the stated

order of succession, the borrower's total monthly payment can be reduced to 31% of the borrower's monthly gross income. *See* SD 09-01, at 8-10. These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, extending the term and re-amortizing the loan (if necessary), and providing a principal forbearance (if necessary). *Id.* Defendants do not have discretion as to how this formula is applied – HAMP rules require servicers to take these enumerated steps in the prescribed order until the target monthly mortgage payment equaling 31% of monthly income is reached. *Id.*

33.    If the application of the waterfall produces terms that yield the target 31% monthly mortgage payment, Defendants must perform the Net Present Value or "NPV" test, which analyzes whether the value of a performing modified loan exceeds the value of foreclosing on the property. A positive NPV indicates that a modified loan is more valuable to the investor than if the loan is not modified. In the case of a positive NPV, HAMP rules *require* the servicer to offer the borrower a mortgage modification. If the NPV test yields a positive result, Defendants must offer the borrower a TPP Contract – a standardized written contract that Saxon entered into with Plaintiffs and thousands of homeowners for a trial modification of their existing loan. *See* SD 09-01, at 4, 14-15.

34.    HAMP regulations in effect at all times relevant to this action are clear that Defendants were required to prequalify borrowers for eligibility for a permanent HAMP modification *before* entering into a TPP Contract. Specifically, the borrower documents a financial hardship either by verbal representations to the servicer, which are later verified with documents as required by the TPP Contract, or by submission of appropriate documents at the outset of the application process. *See* SD 09-01, at 5.

11

35.     Servicers are required to suspend foreclosure proceedings during HAMP evaluations and during trial modification periods. *Id.* at 14.  In addition:

> When discussing the HAMP, the servicer should provide the borrower with information designed to help them understand the modification terms that are being offered and the modification process.  Such communication should help minimize potential borrower confusion, foster good customer relations, and improve legal compliance and reduce other risks in connection with the transaction.   A servicer also must provide a borrower with clear and understandable written information about the material terms, costs, and risks of the modified mortgage loan in a timely manner to enable borrowers to make informed decisions.

*Id.* at 13; *see also* MHA HANDBOOK at 45.

36.     Defendants are also required to acknowledge in writing the receipt of the borrowers' initial HAMP application packages within 10 business days and to include in their response a description of their evaluation, as well as a timeline for processing paperwork. HAMP SD 09-07, 10/8/2009, at 1; *see also* MHA HANDBOOK at 47.  Beginning in March 2010, Defendants were required to provide a toll-free number in all communications with borrowers that would allow them to reach a representative capable of providing specific details about the HAMP modification process.  HAMP SD 10-02. 3/24/2010, at 4; *see also* MHA HANDBOOK at 45.

37.     Thus, by signing the SPA, Defendants were legally bound to comply with HAMP guidelines, including the guidelines that require Defendants, on a timely basis, to identify loans facing default; to evaluate such loans by applying a standardized waterfall and NPV analyses; and to offer permanent HAMP modifications for all loans with a positive NPV.  *Id.*

38.     In the event Defendants conclude that a loan being considered for modification does not have a positive NPV, HAMP guidelines require Defendants to "send a Non-Approval

Notice and consider the borrower for other foreclosure prevention options . . . ."   MHA HANDBOOK at 73.

39.     Additionally, Defendants are required to retain all HAMP-related documentation for each loan serviced for a period of seven years from the receipt or creation of such documentation, including: (a) all documents and information received during the process of determining borrower eligibility, including borrower income verification, total monthly mortgage payment and total monthly gross debt payment calculations, NPV calculations (assumptions, inputs and outputs), evidence of application of each step of the standard waterfall, escrow analysis, escrow advances, and escrow set-up; (b) all documents and information related to the monthly payments during and after the trial period, as well as incentive payment calculations and such other required documents; (c) detailed records of borrower solicitations or borrower-initiated inquiries regarding HAMP, the outcome of the servicer's evaluation for modification under HAMP, and specific justification with supporting details if the request for modification under HAMP was denied.  Defendants' records  must also be retained to document the reason(s) for a trial modification failure; (d) if a HAMP modification is not pursued when the NPV result is "negative," documentation of Defendants' consideration of other foreclosure prevention options; and (e) if a borrower under a HAMP modification lost good standing, documentation of Defendants' consideration of the borrower for other loss mitigation alternatives.  HAMP SD 09-01 4/6/2009, at 13-14; *see also* MHA HANDBOOK at 25-26.

40.     Defendants routinely fail to meet their obligations under the SPA, by, *inter alia*, thwarting implementation of permanent HAMP modifications for eligible mortgagors, keeping inadequate records, failing to disclose accurate information to mortgagors, charging

unreasonable fees and doing so without explanation, violating federal and state laws, and leaving mortgagors in limbo regarding the status of their loans.

**C.    Defendants Benefit From Extracting as Much as Possible in TPP Payments from Distressed Mortgagors.**

41.    Defendants profit substantially by extracting as many TPP payments as possible from mortgagors in distress.    Separate and apart from their obligations under the SPA, Defendants have sound, if selfish, financial reasons for inviting struggling mortgagors to apply for a modification and make trial payments.

42.    Defendants receive $1,000 from the U.S. Government for each HAMP modification they process.    In addition, they stand to make significantly more money by collecting fees and interest on mortgages that are past due, in default or otherwise troubled. Accordingly, Defendants devised and implemented a scheme, under the guise of HAMP, to take advantage of the very mortgagors it has been tasked to assist by impermissibly delaying loan modifications in order to collect excessive fees on troubled mortgages.

43.    According to a report published by the National Consumer Law Center, a servicer's primary source of income is a "monthly servicing fee, [which is] a fixed percentage of the unpaid principal balance of the loans in the pool" of loans that is being serviced.    DIANNE E. THOMPSON, NAT'L. CONSUMER LAW CTR., WHY SERVICERS FORECLOSE WHEN THEY SHOULD MODIFY AND OTHER PUZZLES OF SERVICER BEHAVIOR at vi (2009) [hereinafter, "Servicers Foreclose"].    Therefore, there is a significant incentive for servicers like Defendants to delay foreclosure as long as a mortgagor is making payments in any amount.    As the report explains,

> [t]he monthly fee that the servicer receives based on a percentage of the outstanding principal of the loans in the pool provides some incentive to servicers to keep loans in the pool rather than foreclosing on them, but also provides a significant disincentive to offer principal reductions or other loan modifications that are sustainable in the long term.    In fact, this fee gives servicers an incentive to increase the loan principal by adding delinquent amounts and junk fees.

14

*Id.* Thus, by stringing a mortgagor along in a drawn out modification process, Defendants can maintain or even increase their fees without ever having actually to modify the mortgage.

44.     Additional incentives for Defendants to string along borrowers abound.  For example, Defendants may be required to repurchase loans from the investors in order to permanently modify the loans, presenting a substantial cost and lost revenue that Defendants can avoid by keeping loans in a state of constant default until Defendants eventually foreclose. Servicers Foreclose at 9.  Further, Defendants may collect not only fees purportedly related to foreclosure, but also late fees, processing fees, or other sums that are added to the principal loan amount, increasing the unpaid balances in mortgage pools, and thereby increasing monthly servicing fees.  *Id.* at vi.  Finally, entering into permanent modifications with borrowers may delay a servicer's ability to recover advances it has made to investors of the unpaid principal and interest payment of a non-performing loan.  *Id.*  Servicers get paid before investors, and servicers such as Defendants have every incentive to leverage this reality to their own benefit, to the detriment of mortgagors and investors alike.  *See The Worsening Foreclosure Crisis: Is it Time to Reconsider Bankruptcy Reform?: Hearing Before the Subcomm. on Administrative Oversight and the Courts,* 111th Cong., at 15 (July 23, 2009) (written Testimony of Alys Cohen).

45.     Many loan servicers, including Defendants, have found that they can increase their profits by abusing the HAMP application process and misleading borrowers, rather than genuinely offering eligible borrowers permanent modifications.  Meanwhile, Defendants profit from double tracking mortgagors—initiating and actively pursuing foreclosure while simultaneously collecting payments from mortgagors pursuant to illusory promises of forbearance, permanent modifications, or a "permanent workout solution."

46.     Once Defendants have opted to foreclose by initiating proceedings, mortgagors must rely on Defendants' assurances that the sales are "suspended," "postponed," or otherwise "on hold."   Mortgagors are completely at the mercy of Defendants and have no way of independently verifying or enforcing these promises.   Instead, mortgagors must meet Defendants' demands to continue making payments under temporary payment plans in hopes of forbearance, receiving a modification, or securing an alternative "permanent workout solution."

47.     Under this scheme, Defendants never intend to provide the majority of applicants a loan modification.  Rather, Defendants' goal is to keep loans in default and arrears for as long as possible before ultimately foreclosing to maximize the fees and the payments they can extract from distressed mortgagors.  This is precisely what Defendants accomplish by inviting borrowers to participate in HAMP and then encouraging them to continue making TPP Contract payments when Defendants have no intention to comply with HAMP requirements and/or offer permanent modifications.

**D.     Defendants Intentionally Mislead Borrowers by Stating that They Will Evaluate Borrowers for Eligibility and Offer Permanent Modifications to Qualifying Borrowers, Without the Intent to Do So.**

48.     On information and belief, Defendants send a variation of the same form contract to each borrower that seeks a loan modification.  The agreements typically promise the borrower that if: (1) his/her representations about his/her financial state continue to be true, and (2) he/she complies with the terms of the temporary payment plan, and (3) he/she provides all required documentation, and (4) the Lender determines he/she qualifies, then "the Lender will send [him/her] a Modification Agreement . . . for . . . signature which will modify [his/her] Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date."  *See* Exhibit A.  These contracts are identified as "HAMP TPP," leaving no

doubt that Defendants are promising to confirm the borrower's eligibility pursuant to HAMP guidelines.

49.     The TPP Contract requires that the borrower make at least three monthly loan payments of a reduced amount as set forth in a schedule in the TPP Contract. The TPP Contract establishes a timeframe for performance by both parties and states that "TIME IS OF THE ESSENCE." Exhibit A. Section 2 defines the "Modification Effective Date" as "the first day of the month following the month in which the last Trial Period Payment is due" and defines the Trial Period as ending "on the earlier of" the Modification Effective Date or the termination of the Trial Period. *Id.*

50.     The HAMP program documentation mandates a prompt written determination of eligibility.  After the borrower returns a signed TPP Contract and makes the first month's payment, "the servicer should sign and immediately return an executed copy of the Trial Period Plan to the borrower." SD 09-01, at 15. If the servicer determines that the borrower is not eligible for a permanent modification, "the servicer should promptly communicate that determination to the borrower in writing…" *Id.*

51.     On information and belief, Defendants send the same form cover letters to every borrower receiving a TPP Contract. The "Trial Period Cover Letter" states in its first paragraph, "If you qualify under the federal government's Home Affordable Modification Program and comply with the terms of the Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure." In other instances, Defendants make repeated assurances, both in writing and verbally, that "permanent" modifications or "workout solutions" will be forthcoming and that foreclosure will not proceed. Defendants fail not only to comply with the terms of their contracts with the federal government under HAMP, but also fail to make a good faith effort at compliance

17

with their own promises to borrowers.  Defendants intentionally mislead borrowers who rely on Defendants' promises when they sign TPP Contracts, and then comply with the terms thereof and provide valuable consideration to Defendants, for which Plaintiffs and the Class received nothing in return except harassment, frustration, requests for more documentation, and requests for more payments.

### E.   Defendants Repeatedly Thwarted Plaintiffs' Attempts to Secure a Permanent Loan Modification

52.    Plaintiffs suffered a financial hardship after being saddled with unexpected medical expenses for one of the Plaintiffs' parents.  Shortly thereafter, Plaintiffs applied to Saxon, Plaintiffs' mortgage servicer, for a HAMP mortgage modification in August 2009.  In support of their application, in September 2009, Plaintiffs sent Saxon a package containing all requested financial information and documents, including Plaintiffs' Hardship Affidavit.

53.    After receiving Plaintiffs' financial documents and Hardship Affidavit, Saxon sent to Plaintiffs a loan modification package.  This package included various documents, including a proposed TPP Contract providing for a trial payment period beginning on September 1, 2009, and ending on November 30, 2009.  *See* Exhibit A.  Thus, Plaintiffs were prequalified for their TPP Contract on the basis of verified financial information rather than merely verbally stated financials.  The TPP Contract provided for a modified mortgage payment amount of $1007.50 per month.  *Id.*

54.    Plaintiffs' TPP Contract was executed by Saxon as "attorney-in-fact" for "Deutsche Bank Trust Company Americas, as Trustee for Saxon Asset Securities Trust 2005-4," which is an entity that acquired ownership of Plaintiffs' loan and pooled it with other mortgages as an investment vehicle.  *Id.*

18

55.     By executing the TPP Contract as attorney-in-fact for Deutsche Bank Trust Company Americas, as Trustee for Saxon Asset Securities Trust 2005-4, Saxon represented that it was duly authorized to bind itself and the investor who owns Plaintiffs' mortgage to the terms of the TPP Contract, and that Saxon had obtained all necessary waivers and consents from this investor that were necessary to permanently modify Plaintiffs' mortgage.

56.     Plaintiffs accepted Saxon's offer by executing the TPP Contract and promptly returned the signed contract to Saxon.

57.     During the three month trial period of the TPP Contract, and at all relevant times thereafter, Plaintiffs fully performed all of their obligations under the TPP Contract, including making all payments due on time and providing additional copies of previously supplied documents that were requested by Saxon.

58.     Plaintiffs TPP Contract with Saxon is supported by consideration. In addition to making trial period payments, the TPP Contract required Plaintiffs to: (1) provide extensive financial information that was not required under their original mortgages;[1] (2) make representations in a hardship affidavit concerning their personal circumstances;[2] (3) make payments into newly established escrow accounts;[3] and (4) undergo credit counseling if Defendants so requested.[4]

---

[1] *See* SD 09-01, at 2 ("The borrower documents a financial hardship and represents that (s)he does not have sufficient liquid assets to make the monthly mortgage payments by completing a … Hardship Affidavit and provides the required income documentation.").

[2] *See id.*

[3] *See id.* ("The borrower agrees to set up an escrow account for taxes and hazard and flood insurance prior to the beginning of the trial period if one does not currently exist").

[4] *See id.* at 11 ("The borrower must represent in writing in the HAMP documents that (s)he will obtain such counseling.").

59.     Based on the language of the TPP Contract and Plaintiffs' performance of all of their obligations under the TPP Contract, Saxon was required to tender Plaintiffs a permanent Home Affordable Modification Agreement as it expressly promised in the TPP Contract.

60.     Despite Plaintiffs' performance of its obligations under the TPP Contract, Defendants failed to perform their obligations.

61.     Months after the three month trial period had concluded, in April 2010, Plaintiffs attempted to pay school and other taxes on the property.  However, they were informed by the tax authorities that these taxes had already been paid.  Prior to this time, Saxon had never informed Plaintiffs that Saxon would pay taxes on the property, and Saxon had never informed Plaintiffs that Saxon would escrow or was escrowing funds for this purpose.  Plaintiffs promptly contacted Saxon to attempt to obtain information about this.

62.     Plaintiffs received from Saxon a so-called Escrow Shortage Statement, dated July 16, 2010.  Plaintiffs called Saxon to inquire with respect to this statement, and a customer service representative by the name of Rose, employee identification number 20997, told Plaintiffs to disregard the statement.  Rose also told Plaintiffs that Plaintiffs' status with respect to HAMP loan modification was current and that Plaintiffs should continue to make the modified payments of $1,007.50 per month.

63.     On October 14, 2010, Plaintiffs received from Saxon an Act 91 Notice dated October 12, 2010.  The notice stated, falsely, that Plaintiffs were past due in the amount of $23,210.64, including late fees, escrow charges, and inspection charges, with respect to the period November 1, 2009 - October 12, 2010.

64.     Plaintiffs promptly called Saxon with respect to the Act 91 Notice, speaking to three different customer service representatives, Bertha, employee identification number 9065;

Alisha, employee identification number 9806; and Rick, no employee identification number given.  Each representative stated that, without providing any notice to Plaintiffs, Saxon had removed Plaintiffs from HAMP on April 29, 2010, despite the fact that, as each representative confirmed, Plaintiffs had made all payments on time.  None of the representatives could explain the reason or basis for Saxon's Act 91 Notice to Plaintiffs.

65.     In accord with the Act 91 Notice, Plaintiffs had a face-to-face meeting with a certified credit and housing counselor, Mary E. Thompson, on October 26, 2010.  Working with Ms. Thompson, Plaintiffs applied for a HEMAP loan through the Commonwealth of Pennsylvania in order to obtain funds to discharge any alleged past due amounts owing to Saxon. Plaintiffs were assigned HEMAP account number HE0002384907 10.

66.     Plaintiffs qualified for the HEMAP loan for which they applied, but they did not obtain that loan, and thus were unable to satisfy the amounts that Saxon asserted was due from Plaintiffs, as a result of Saxon's failure to supply required information to the Commonwealth of Pennsylvania.  Saxon's failure to supply this information, which was readily available to Saxon, was the reason Plaintiffs failed to obtain the HEMAP loan.

67.     Defendants claim that they removed Plaintiffs from HAMP on April 29, 2010. Defendants assert that the basis for doing so was that Plaintiffs' income exceeded the ceiling of 31 percent of current housing expense.  Defendants admit that they failed for more than five months to inform Plaintiffs that they had removed Plaintiffs from HAMP.

68.     By letter dated April 21, 2011, Plaintiffs were advised that the servicing of their mortgage was being transferred from Saxon to Ocwen, effective May 16, 2011.

69.     Thereafter, Ocwen advised Plaintiffs that they would again needed to apply for a HAMP modification, but if they did not qualify for HAMP then they would be considered for a

21

so-called in-house modification.   Accordingly, Plaintiffs applied to Ocwen for a HAMP modification, which Ocwen denied.

70.     By letter dated June 28, 2011, Ocwen offered Plaintiffs an in-house modification on terms that were significantly worse than the terms of the HAMP modification promised in the TPP Contract.   Specifically, the Ocwen modification provided for an initial total monthly payment of $1,285.39, consisting of principal and interest payments of $1,000.02 and escrow payments of $285.37.  Upon modification, the annual rate of interest on Plaintiffs' mortgage will be 2.000 percent until August 16, 2016, at which time the rate will increase to 4.5 percent until the loan reaches maturity.   The Ocwen modification offer did not include an amortization schedule, but it did contain a "BALLOON DISCLOSURE," which advised Plaintiffs that the modified loan will have a balloon feature such that even if Plaintiffs make all payments in full and on time, their loan will not be paid in full by the final payment date.   Instead, a single balloon payment will be due on December 1, 2035.  However, this purported disclosure does not reveal the amount of the balloon payment or even how such a payment will be calculated.   In essence, this balloon payment is a financial black hole.

71.     Plaintiffs were advised that their property is in foreclosure.  Because they were fearful of losing their to foreclosure by Ocwen, Plaintiffs have accepted the Ocwen in-house modification.

## V.      CLASS ALLEGATIONS

72.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

73.     Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Class consisting of:

> a.     All Pennsylvania homeowners whose mortgage loans have been serviced
> by Defendants and who, since April 13, 2009, (i) have entered into a TPP
> Contract with Defendants and made all payments as required by their TPP

22

Contract and complied with Defendants' requests for documentation, and (ii) have not received a permanent Home Affordable Modification and did not receive a timely written notification to borrower explaining the reason for denying the permanent modification (the "Denied Class").

b.   All Pennsylvania homeowners whose mortgage loans have been serviced by Defendants and who, since April 13, 2009, (i) have entered into a TPP Contract with Defendants and made all payments as required by their TPP Contract and complied with Defendants' requests for documentation, (ii) but were improperly reported to credit reporting agencies as delinquent during the TPP (the "Credit Reporting Class").

c.   All Pennsylvania homeowners whose mortgage loans have been serviced by Defendants and who, since April 13, 2009, (i) have entered into a TPP Contract with Defendants and made all payments as required by their TPP Contract and complied with Defendants' requests for documentation, (ii) but were improperly placed in foreclosure and/or charged for various foreclosure-related fees (the "Foreclosure Class").

74.   Excluded from the Class are governmental entities, Defendants, their affiliates and subsidiaries, Defendants' current employees and current or former officers, directors, agents, and representatives, and their family members.

75.   Plaintiffs do not know the exact size or identities of the members of the proposed Class, since such information is in the exclusive control of Defendants. Plaintiffs believe that the Class encompasses many hundreds and perhaps thousands of individuals whose identities can be readily ascertained from Defendants' books and records. Therefore, the proposed Class is so numerous that joinder of all members is impracticable.

76.   Based on the size of the modifications at issue, Plaintiffs believe that the amount in controversy exceeds $5 million.

77.   All members of the Class have been subject to and affected by a uniform course of conduct by Defendants that was designed to evade the requirements of HAMP and avoid permanent loan modifications in an effort to increase Defendants' income through, *inter alia*,

23

maintaining high service fees on larger principal balances, collecting additional late fees and process management fees and avoiding increased fixed overhead costs.

78.     This course of conduct includes: (1) prequalifying a borrower for a permanent loan modification under HAMP or failing to properly and timely conduct the required pre-qualification analysis, (2) making the borrower an offer for a permanent modification by sending him or her a TPP Contract, and then (3) failing to permanently modify the loan after the borrower accepts the contract and makes the three required monthly modified loan payments and supplies all required documentation, thus fulfilling all of his or her contractual obligations under it.

79.     This course of conduct also includes: stringing out, delaying or otherwise hindering the modification process in violation of HAMP rules by:

(1) instituting or pursuing foreclosure actions while borrowers are in the trial period or instituting foreclosure actions after the trial period despite the fact that borrowers have fully complied with the TPP Contract,

(2) charging borrowers late fees and penalties during their trial periods,

(3) reporting borrowers to credit agencies for delinquency while they are on the trial period,

(4) repeatedly requesting that borrowers send the required documentation over and over again,

(5) failing to allocate adequate resources such as sufficient trained staff to facilitate the modification process,

(6) failing to establish proper communication between internal corporate departments necessary to facilitate borrowers' modification requests,

24

(7) failing to timely notify borrowers at the end of the three month trial period that they have been provided or have been denied a permanent HAMP modification, and

(8) denying permanent HAMP modifications for reasons that are false, untrue and/or entirely inaccurate.

80.    The claims are based on standardized written form contracts (the TPP Contracts) and the uniform HAMP rules contained in the Supplemental Directives, Servicer Handbook and other program documentation which govern the entirety of the Making Home Affordable Program and all aspects of loan modification under HAMP.  There are questions of law and fact that are common to the class, and predominate over any questions affecting only individual members of the Class.

81.    These questions include, but are not limited to the following:

    a.    The nature, scope and operation of Defendants' obligations to homeowners under HAMP;

    b.    Whether Defendants engaged in the illegal course of conduct described in this Complaint.

    c.    Whether Defendants' receipt of an executed TPP Contract, along with supporting documentation and three monthly payments, creates a binding contract or otherwise legally obligates Defendants to offer class members a permanent HAMP modification;

    d.    Whether Defendants' failure to provide permanent HAMP modifications in the circumstances described herein, where the borrowers have timely made the requisite three monthly payments pursuant to the TPP Contract and supplied the necessary documentation, amounts to a breach of contract and/or a breach of the covenant of good faith and fair dealing;

    e.    Whether Defendants' conduct violates Pennsylvania's Unfair Trade Practices and Consumer Protection Act and corresponding regulations;

    f.    Whether Defendants' conduct violates Pennsylvania's Fair Credit Uniformity Act and corresponding regulations;

    g.    Whether Defendants' conduct violates the federal Fair Debt Collections Practices Act; and

h.      Whether the Court can order damages and enter injunctive relief.

82.      The claims of the individual named Plaintiffs are typical of the claims of the Class and do not conflict with the interests of any other members of the Class in that both Plaintiffs and the other members of the Class were subject to the same conduct, were subject to the terms of the same agreement and were met with the same absence of a permanent modification.

83.      The individual named Plaintiffs will fairly and adequately represent the interests of the Class.  Plaintiffs are committed to the vigorous prosecution of the Class' claims and have retained attorneys who are qualified to pursue this litigation and have experience in class actions, including consumer protection actions.

84.      A class action is superior to other methods for the fast and efficient adjudication of this controversy.  A class action regarding the issues in this case does not create any problems of manageability.

85.      This putative class action meets the requirements of Fed. R. Civ. P. 23(b)(2) and Fed. R. Civ. P. 23(b)(3).

86.      Defendants have acted or refused to act on grounds that apply generally to the Class so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## VI.      CAUSES OF ACTION

### COUNT I – BREACH OF CONTRACT / BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

87.      Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

88.      Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

26

89.    Plaintiffs and members of the Class entered into written TPP Contracts with Defendants.

90.    Plaintiffs and members of the Class formed binding and enforceable agreements when they executed written TPP Contracts, and/or when they made the first required payment under the TPP offered in writing by Defendants.

91.    Payments in accordance with an executed TPP Contract; the provision of extensive financial information that is not required under Plaintiffs' original mortgage; making representations in a hardship affidavit concerning Plaintiffs' personal circumstances; making payments into newly established escrow accounts; and agreeing to undergo credit counseling if Defendants so requested constitute consideration for the TPP Contract.

92.    Defendants failed to perform under the TPP Contracts with Plaintiffs and members of the Class.  Defendants' refusal to perform their duties under the TPP Contracts was unlawful, without justification and/or excuse, and constituted a total and material breach of the TPP Contracts between the parties.

93.    Defendants breached the TPP Contracts with Plaintiffs and members of the Class by failing to offer Plaintiffs and members of the Class permanent HAMP modifications after they made the required TPP payments and submitted the required documentation.

94.    Plaintiffs and all members of the Class gave consideration that was fair and reasonable, and have performed all conditions, covenants, and promises required to be performed under their TPP Contracts with Defendants.

95.    As a result of Defendants' breach of the TPP Contracts, Plaintiffs and members of the Class suffered and will continue to suffer reasonable and foreseeable consequential damages resulting from such breaches, including payment of increased interest, longer loan payoff times,

higher principle balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages for breach of contract.

96.     Plaintiffs and the Class have been damaged by Defendants' breach of the TPP Contracts in an amount to be proven at trial.

## COUNT II – PROMISSORY ESTOPPEL

97.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

98.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

99.     Defendants entered into the TPP Contracts described above with Plaintiffs and the Class that obligated Defendants to provide Plaintiffs and other members of the Class a permanent loan modification under HAMP if all trial period plan payments as set forth in the TPP Contract were timely made and required documentation was submitted.

100.     In the alternative, under the theory of promissory estoppel, Defendants are estopped from denying the existence of an agreement between themselves and Plaintiffs and with other Class Members because Defendants' TPP Contracts were intended to and did induce Plaintiffs and the Class to rely, Plaintiffs' and the Class' reliance on the TPP Contracts was reasonable and justified, and that reliance was to the detriment of Plaintiffs and the Class.

101.     Defendants' TPP Contracts were intended to induce Plaintiffs and the Class to rely on them and make monthly TPP payments and Plaintiffs and the Class did, indeed, rely on Defendants' representations, by submitting TPP payments.

102.     Given the language in the TPP Contract, Plaintiffs' and the Class' reliance was reasonable and justified.

28

103.     Plaintiffs' and the Class' reliance was to their detriment.  For example, those who complied with the TPP contracts but were denied a permanent modification have been required to pay increased interest, higher principal balances, higher service fees, and extended payoff time periods.  They have been deterred from seeking other remedies to address their default and/or unaffordable mortgage payments, have incurred damage to their credit, costs and expenses to prevent or fight foreclosure and other damages and have been subject to additional income tax liability.

104.     Plaintiffs and the Class have been damaged by Defendants' actions and representations in an amount to be proven at trial.

## COUNT III – VIOLATIONS OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. § 201-2(xxi)

105.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

106.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class above.

107.     This is a claim for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-2(xxi).

108.     At all relevant times material hereto, Defendants conducted trade and commerce within the meaning of the UTPCPL.

109.     Plaintiffs and the Class are "persons" as defined and construed under the UTPCPL.

110.     Defendants' conduct as set forth herein constitutes and unconscionable commercial practice comprised of deceptive acts or practices in violation of the UTPCPL, 73 P.S. § 201-2(xxi), including their practice of leading borrowers to believe that Defendants would offer permanent HAMP modifications of their mortgages upon successfully completing a TPP

and due to Defendants' illegal collection of late fees and penalties in violation of HAMP regulations.

111.    Defendants' conduct as set forth herein has been unfair in violation of the UTPCPL because the acts or practices violate established public policy, and because the harm they cause to consumers in Pennsylvania greatly outweighs any benefits associated with those practices.

112.    Plaintiffs and the Class suffered actual and ascertainable losses of money or property as a result of Defendants' unconscionable, deceptive and/or unfair trade practices, including but not limited to: payment of increased interest and service fees, longer loan payoff times, higher principle balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages.

**COUNT III – VIOLATION OF PENNSYLVANIA FAIR CREDIT UNIFORMITY ACT**

113.    Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

114.    Saxon is a debt collector/creditor as defined in 73 Pa.C.S. §2270.3.

115.    Ocwen is a debt collector/ creditor as defined in 73 Pa.C.S. § 2270.3.

116.    Plaintiffs are consumers as defined in 73 Pa. C. S.§2270.3.

117.    Defendants violated the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa.C.S. § 2270.4(b)(5)(ii) by their false representation of the amount and legal status of Plaintiffs' alleged debt.

118.    Defendants violated the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa.C.S.§2270.4(b)(6)(i) by attempting to collect an amount from Plaintiffs which is neither expressly authorized by the agreement creating the debt nor permitted by law.

119.     Defendants violated 73 Pa.C.S.§ 2270.4(a) by violating 15 U.S.C.§ 1692, as described above.

120.     Defendants' violations of the Pennsylvania Fair Credit Extension Uniformity Act constitute per se violations of the Pennsylvania UTPCPL, 73 Pa.C.S. § 201-1 *et seq.*

121.     As a result of Defendants' violations, Plaintiffs and the members of the Class have suffered ascertainable losses entitling them to an award of treble damages and attorneys' fees  pursuant to 73 Pa.C.S. § 201 – 9.2.

122.     Plaintiffs and the Class are entitled to statutory damages under the Pennsylvania UTPCPL, 73 Pa. C.S. § 201-1 *et seq.*, based on Defendants' violations of the Pennsylvania Fair Credit Extension Uniformity Act.  Because violation of the Fair Credit Extension Uniformity Act is a per se violation of the UTPCPL, it does not matter whether particular individuals were deceived or misled by Defendants' illegal demands.

**COUNT IV - VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT**

123.     Plaintiffs repeat and re-allege every allegation above as if set forth herein in full.

124.     Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

125.     This is a claim for violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*

126.     The debt that Defendants seek to collect from Plaintiffs is a consumer debt within the meaning of the FDCPA, and Defendants are debt collectors as defined therein.

127.     Defendants violated 15 U.S.C.  § 1692f(1) by attempting to collect an amount from Plaintiffs that is not expressly authorized by the agreement creating the debt, including the TPP Contract, or permitted by law, including HAMP.

31

128.    Defendants violated 15 U.S.C. § 1692e(2)(A) by sending Plaintiffs communications that misrepresented the amount and legal status of Plaintiffs' mortgage debt.

129.    Plaintiffs were victims of a general practice by Defendants.

130.    Plaintiffs and the Class are entitled to class-wide statutory damages under the FDCPA, without regard to whether particular Class members were deceived or misled by Defendants' communications in connection with TPP Contracts and HAMP.

## VII.    PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully request the following relief:

a.    Certify this case as a class action and appoint the named Plaintiffs to be Class representatives and their counsel to be Class counsel;

b.    Enter a judgment declaring the acts and practices of Defendants complained of herein to constitute a breach of contract and a breach of the covenant of good faith and fair dealing, as well as a declaration that they are required by the doctrine of promissory estoppel to offer permanent modifications to Class members on the terms promised in Class members' temporary modifications, together with an award of monetary damages and other available relief on those claims;

c.    Grant a permanent or final injunction enjoining Defendants' agents and employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the members of the Class;

d.    Order Defendants to adopt and enforce a policy that requires appropriate training of their employees and agents regarding their duties under HAMP;

e.    Order specific performance of Defendants' contractual obligations together with other relief required by contract and law;

f.    Award actual and statutory damages to the Plaintiffs and the Class in amounts to be proven at trial;

g.    Award restitution and prejudgment interest;

h.    Award Plaintiffs the costs of this action, including the fees and costs of experts, together with reasonable attorneys' fees; and

i.    Grant Plaintiffs and the Class such other and further relief as this Court finds necessary and proper.

## VIII.   JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted,

DATED:  July 20, 2011

**BERGER & MONTAGUE, P.C.**

By /s/Todd S. Collins
Todd S. Collins
Eric Lechtzin
1622 Locust Street
Philadelphia, PA  19103
Telephone:  215-875-3000
Facsimile:  215-875-4613
E-mail: tcollins@bm.net
E-mail: elechtzin@bm.net

Ann Miller
**ANN MILLER, LLC**
834 Chestnut Street, Suite 206
Philadelphia, PA 19107
Telephone:  215-238-0468
Facsimile:  215-574-0699
E-mail: am@attorneyannmiller.com

*Attorneys for Plaintiffs and the Class*

33

# Exhibit A

## (Redacted)

Investor Loan # :

# HOME AFFORDABLE MODIFICATION TRIAL PERIOD PLAN
## (Step One of Two-Step Documentation Process)

Trial Period Plan Effective Date:   September 1, 2009

Borrower ("I") [1]: LISA M. CAVE
              SCOTT W. CAVE

Lender ("Lender"):
Deutsche Bank Trust Company Americas, as Trustee for Saxon Asset Securities Trust 2005-4

Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): November 23, 2005
Loan Number:

Property Address ("Property"):

If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3, that would amend and supplement (1) the Mortgage on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this Plan and not defined have the meaning given to them in the Loan Documents.

If I have not already done so, I am providing confirmation of the reasons I cannot afford my mortgage payment and documents to permit verification of all of my income (except that I understand that I am not required to disclose any child support or alimony unless I wish to have such income considered) to determine whether I qualify for the offer described in this Plan (the "Offer"). I understand that after I sign and return two copies of this Plan to the Lender, the Lender will send me a signed copy of this Plan if I qualify for the Offer or will send me written notice that I do not qualify for the Offer. This Plan will not take effect unless and until both I and the Lender sign it and Lender provides me with a copy of this Plan with the Lender's signature.

1.    **My Representations.**   I certify, represent to Lender and agree:

     A.    I am unable to afford my mortgage payments for the reasons indicated in my Hardship Affidavit and as a result, (i) I am either in default or believe I will be in default under the Loan Documents in the near future, and (ii) I do not have sufficient income or access to sufficient liquid assets to make the monthly mortgage payments now or in the near future;

     B.    I live in the Property as my principal residence, and the Property has not been condemned;

---

[1] If there is more than one Borrower or Mortgagor executing this document, each is referred to as "I". For purposes of this document words signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

HOME AFFORDABLE MODIFICATION - TRIAL PERIOD PLAN
Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services ©2009

Form 3156 3/09 (rev 8/09)
D14103   (0909)
Page 1 of 6

C.   There has been no change in the ownership of the Property since I signed the Loan Documents;

D.   I am providing or already have provided documentation for all income that I receive (and I understand that I am not required to disclose any child support or alimony that I receive, unless I wish to have such income considered to qualify for the Offer);

E.   Under penalty of perjury, all documents and information I have provided to Lender pursuant to this Plan, including the documents and information regarding my eligibility for the program, are true and correct; and

F.   If Lender requires me to obtain credit counseling, I will do so.

G.   I was discharged in a Chapter 7 bankruptcy proceeding subsequent to the execution of the Loan Documents. Based on this representation, Lender agrees that I will not have personal liability on the debt pursuant to this Plan.

2.   **The Trial Period Plan.** On or before each of the following due dates, I will pay the Lender the amount set forth below ("Trial Period Payment"), which includes payment for Escrow Items, including real estate taxes, insurance premiums and other fees, if any, of U.S. $1,007.50.

| Trial Period Payment # | Trial Period Payment | Due Date On or Before |
|---|---|---|
| 1 * | $ 1,007.50 | 09/01/2009 * |
| 2 | $ 1,007.50 | 10/01/2009 |
| 3 | $ 1,007.50 | 11/01/2009 |

The Trial Period Payment is an estimate of the payment that will be required under the modified loan terms, which may be finalized in accordance with Section 3 below. The actual payments under the modified loan terms, however, may be different.

*I understand that my first payment and this signed Trial Period Plan must be received by the Lender no later than September 1, 2009 or I may not be accepted into the Home Affordable Modification Program.

I agree that during the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

A.   TIME IS OF THE ESSENCE under this Plan. This means I must make all payments on or before the days that they are due;

B.   Except as set forth in Section 2.C. below, the Lender will suspend any scheduled foreclosure sale, provided I continue to meet the obligations under this Plan, but any pending foreclosure action will not be dismissed and may be immediately resumed from the point at which it was suspended if this Plan terminates, and no new notice of default, notice of intent to accelerate, notice of acceleration, or similar notice will be necessary to continue the foreclosure action. All rights to such notices are hereby waived by me to the extent permitted by applicable law;

C.   If my property is located in Georgia, Hawaii, Missouri, or Virginia and a foreclosure sale is currently scheduled, the foreclosure sale will not be suspended and the Lender may foreclose if I have not made each and every Trial Period Payment that is due through the end of the month preceding the month in which the foreclosure sale is scheduled to occur. If a foreclosure sale occurs pursuant to this Section 2.C., this Plan shall be deemed terminated;

D.   The Lender will hold the payments received during the Trial Period in a non-interest bearing account until they total an amount that is enough to pay my oldest delinquent monthly payment on my loan in full. I understand the Lender will not pay me interest on the amounts held in the account. If there is any remaining money after such payment is applied, such remaining funds will be held by the Lender and not posted to my account until they total an amount that is enough to pay the next oldest delinquent monthly payment in full;

E.   When the Lender accepts and posts a payment during the Trial Period it will be without prejudice to, and will not be deemed a waiver of, the acceleration of the loan or foreclosure action and related activities and shall not constitute a cure of my default under the Loan Documents unless such payments are sufficient to completely cure my entire default under the Loan Documents;

HOME AFFORDABLE MODIFICATION - TRIAL PERIOD PLAN
Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
WLP ®
Wolters Kluwer Financial Services ©2009

Form 3156  2/09 (rev. 8/09)

D14103    (0908)
Page 2 of 5

F.   If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; (iii) the Lender determines that any of my representations in Section 1 were not true and correct as of the date I signed this Plan or are no longer true and correct at any time during the Trial Period; or (iv) I do not provide all information and documentation required by Lender, the Loan Documents will not be modified and this Plan will terminate.  In this event, the Lender will have all of the rights and remedies provided by the Loan Documents, and any payment I make under this Plan shall be applied to amounts I owe under the Loan Documents and shall not be refunded to me; and

G.   I understand that this Plan is not a modification of the Loan Documents and that the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed.  I further understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify or if I fail to meet any one of the requirements under this Plan.  If, under the Lender's procedures, a title endorsement(s) and/or subordination agreement(s) are required to ensure that the modified Loan Documents retain first lien position and are fully enforceable, I understand and agree that the Lender will not be obligated or bound to make any modification of the Loan Documents or to execute the Modification Agreement if the Lender has not received an acceptable title endorsement(s) and/or subordination agreement(s) from other lien holders, as Lender determines necessary.

3.   **The Modification.**   I understand that once Lender is able to determine the final amounts of unpaid interest and any other delinquent amounts (except late charges) to be added to my loan balance and after deducting from my loan balance any remaining money held at the end of the Trial Period under Section 2.D. above, the Lender will determine the new payment amount.  If (1) my representations in Section 1 were and continue to be true in all material respects; (2) I comply with the requirements in Section 2; (3) I provide the Lender with all required information and documentation; and (4) the Lender determines that I qualify, the Lender will send me a Modification Agreement for my signature which will modify my Loan Documents as necessary to reflect this new payment amount and waive any unpaid late charges accrued to date. The Modification Agreement will provide that, as of the Modification Effective Date, a buyer or transferee of the Property will not be permitted, under any circumstance, to assume the loan unless permitted by applicable State or Federal law, rules or regulations. This Plan shall terminate the day before the Modification Effective Date and the Loan Documents, as modified by a fully executed Modification Agreement, shall govern the terms between the Lender and me for the remaining term of the loan. Provided I make timely payments during the Trial Period and both the Lender and me I execute the Modification Agreement, I understand that my first modified payment will be due on the Modification Effective Date (i.e., on the first day of the month following the month in which the last Trial Period Payment is due).

4.   **Additional Agreements.**   I agree to the following:

A.   That all persons who signed the Loan Documents or their authorized representative(s) have signed this Plan, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Plan (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.   To comply, except to the extent that they are modified by this Plan, with all covenants, agreements, and requirements of the Loan Documents, including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my loan.

C.   Intentionally Deleted.

D.   That all terms and provisions of the Loan Documents remain in full force and effect; nothing in this Plan shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents.

E.   That I will execute such other and further documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Plan; or (ii) correct the terms and conditions of this Plan if an error is discovered.

HOME AFFORDABLE MODIFICATION  - TRIAL PERIOD PLAN
Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services ©2009

Form 3156  3/09 (rev. 8/09)

D14403    (0908)
Page 3 of 5

In Witness Whereof, the Lender and I have executed this Plan.

_____ (Seal)   4/30/09
LISA M. CAVE                      -Borrower        Date

_____ (Seal)   4/30/2009
SCOTT W. CAVE                     -Borrower        Date

_____ (Seal)   _____
                                  -Borrower        Date

_____ (Seal)   _____
                                  -Borrower        Date

Deutsche Bank Trust Company Americas, as Trustee for Saxon Asset Securities Trust 2005-4, by _____ (Seal)
Saxon Mortgage Services, Inc., as its attorney-in-fact                                                                        -Lender

By: _____ (Seal)   _____
                                                     Date

HOME AFFORDABLE MODIFICATION - TRIAL PERIOD PLAN
Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
VMP ®
Wolters Kluwer Financial Services ©2009

Form 3156  2/09 (rev. 8/09)
D14103    (0908)
Page 5 of 8