IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LISA CAVE AND SCOTT CAVE, on behalf of themselves and all others similarly situated | : : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| SAXON MORTGAGE SERVICES, INC. AND OCWEN LOAN SERVICING, LLC | : : | NO.  11-4586 |

## MEMORANDUM

**Padova, J.**                                                                                         **May 30, 2012**

Plaintiffs Lisa and Scott Cave bring this proposed class action for breach of contract and other claims arising out of Defendants' failures to permanently modify home mortgage loans after providing homeowners with temporary modifications.  Defendant Saxon Mortgage Services, Inc. ("Saxon") has filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the Motion is granted in part and denied in part.

**I.      BACKGROUND**

        A.      The Home Affordable Modification Program

In February 2009, the Secretary of the Treasury and the Director of the Federal Housing Finance Agency announced the Making Home Affordable  program (the "MHA"), an effort to stem the foreclosure crisis.  As part of the MHA, the Home Affordable Modification Program ("HAMP") was created.  Under HAMP, borrowers who are struggling to pay their mortgages can apply to their loan servicer for a permanent loan modification to get a reduced monthly payment.  Defendants Saxon and Ocwen Loan Servicing, LLC, are loan servicers who entered into agreements with the federal government in which they agreed to comply with HAMP and provide qualifying borrowers with permanent modifications.

After a borrower applies for permanent modification, loan servicers are required under

HAMP regulations to determine, based on financial information submitted by the borrower, whether the borrower is eligible for a loan modification which would reduce the borrower's monthly loan payment to 31% of their gross monthly income.[1]

Before a borrower receives a permanent modification, a loan servicer and a borrower enter into a 3-month trial period, during which the borrower makes lower monthly payments towards their mortgage.  The terms of the trial period are governed by a form contract entitled "HAMP TPP" (the "TPP").[2]  The TPP states that the Lender will send the borrower a permanent modification agreement if: 1) the borrower's representations of their financial state continue to be true; 2) the borrower complies with the terms of the temporary payment plan; 3) the borrower provides all required documentation; and 4) the Lender determines that the borrower qualifies.  The TPP requires that the borrower make three monthly payments of a reduced amount.  In the introduction to the TPP, the TPP states that the loan servicer will provide a borrower with a permanent modification if the borrower is qualified, or will send the borrower a written denial if they do not qualify.

Plaintiffs allege, however, that Defendants never intended to provide permanent loan modifications to the majority of applicants.  Rather, Defendants routinely failed to meet their

---

[1]Specifically, HAMP requires Defendants to take a specific set of steps, called a "waterfall," to reach the target monthly payment of 31% of income.  These steps include capitalizing accrued interest and escrow advances, reducing the interest rate, and providing a principal forbearance.  If the application of these steps produces terms that yield the target monthly payment, Defendants must perform the Net Present Value test to determine whether a modified loan agreement is more valuable to the investor than no modification.  If the modification is more valuable, Defendants must offer a contract to borrowers.  If the modification would be less valuable to the investor, Defendants must send a "Non-Approval" Notice to the borrower and consider the borrower for other foreclosure prevention options.  HAMP regulations require that Defendants pre-qualify borrowers for a permanent modification before entering into a trial period contract.

[2]This agreement is Exhibit A to the Complaint.

obligations under HAMP by, *inter alia*, thwarting implementation of permanent HAMP modifications, keeping inadequate records, failing to disclose accurate information to mortgagors, charging unreasonable fees without explanation, violating federal and state laws, and leaving mortgagors in limbo regarding the status of their loans.  Since HAMP's inception through November 2010, loan servicers cancelled roughly 729,000 of the 1.4 million trial modifications started.  Saxon put about 40,000 homeowners into trials, but only about 11,000 received a permanent modification.[3]

      B.      <u>Plaintiffs' TPP</u>

In August 2009, after incurring unexpected parental medical expenses, Plaintiffs Lisa and Scott Cave applied to Defendant Saxon, their mortgage servicer, for a HAMP mortgage modification. In September 2009, in support of their application, Plaintiffs sent Saxon a package containing all requested financial information and documents, including a Hardship Affidavit.  After receiving these documents, Saxon sent Plaintiffs a loan modification package, which included a proposed TPP providing for a trial payment period beginning on September 1, 2009, and ending on November 30, 2009, and a modified monthly payment of $1007.50.

Plaintiffs allege that they were pre-qualified for their TPP on the basis of verified financial information.  Plaintiffs accepted Saxon's offer by executing the TPP and promptly returning the signed contract to Saxon.  Plaintiffs fully performed all of their obligations under the TPP, including making all payments on time and providing additional copies of previously supplied documents as

---

[3]Plaintiffs allege that it was profitable for Saxon to enter into temporary modifications but not offer borrowers permanent modifications.  Defendants receive $1,000 from the U.S. Government for each HAMP modification they process, collect fees and interests on mortgages that are past due or in default, and delay loan modifications to collect excessive fees on troubled mortgages. Defendants further profit from "double tracking" mortgagors - initiating foreclosure while still collecting payments pursuant to illusory promises of forbearance, permanent modifications, or a "permanent workout solution."  (Compl. ¶ 45.)

requested by Saxon.

In April 2010, months after the trial period ended, Plaintiffs attempted to pay school and other taxes on their property, but were informed that these taxes had already been paid. Saxon had never told them that it would pay taxes on the property and that it was escrowing funds for this purpose. Plaintiffs subsequently received from Saxon an Escrow Shortage Statement, dated July 16, 2010. Plaintiffs called Saxon, and a customer service representative told them to disregard the statement, that their loan modification was current, and that they should continue to make the modified monthly payments of $1,007.50.

On October 14, 2010, Plaintiffs received from Saxon an Act 91 Notice which stated that they were past due in the amount of $23,210.64, including late fees, escrow charges, and inspection charges, with respect to the period November 1, 2009, to October 12, 2010. Plaintiffs called Saxon, and three representatives told them that Saxon had removed them from HAMP on April 29, 2010, without notice to them and despite the fact that they had made all payments on time. No representative could explain the reason or basis for Saxon's Act 91 Notice. Defendants claim that they removed Plaintiffs from HAMP on April 29, 2010, because Plaintiffs' monthly housing expense did not exceed 31% of their income.

In accord with the Act 91 Notice, Plaintiffs had a meeting with a certified credit and housing counselor, after which they applied for a Homeowners Emergency Mortgage Assistance Program ("HEMAP") loan through the Commonwealth of Pennsylvania in order to obtain funds to discharge any alleged past due amounts owed to Saxon. Plaintiffs qualified for the HEMAP loan, but did not obtain the loan as a result of Saxon's failure to provide certain required information to the Commonwealth.

4

By letter dated April 21, 2011, Plaintiffs were advised that the servicing of their mortgage was being transferred from Saxon to Defendant Ocwen, effective May 16, 2011.  Ocwen informed Plaintiffs that they would again need to apply for a HAMP modification, and if they did not qualify for HAMP then they would be considered for an in-house modification.  Plaintiffs applied to Ocwen for a HAMP modification, which Ocwen denied.

By letter dated June 28, 2011, Ocwen offered Plaintiffs an in-house modification on terms that were significantly worse than the terms of the HAMP modification set forth in the TPP.  The Ocwen modification provided for an initial monthly payment of $1,285.39, of which $1,000.02 went to principal and interest payments, and $285.37 to escrow.  Upon modification, the annual rate of interest on Plaintiffs' mortgage would be 2% until August 2016, and 4.5% from then until the loan reached maturity.  Under the modified terms, even if Plaintiffs made all payments in full and on time, their loan would not be paid in full by the final payment date.  Instead, a single balloon payment would be due on December 1, 2035, in an unspecified amount.  Plaintiffs were advised that their property was in foreclosure and, fearing that result, accepted the Ocwen in-house modification.

According to the Complaint, Plaintiffs' injuries from Defendants' breach of the TPP and other actions include:  payment of increased interest; longer loan payment times; higher principal balances; deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments; damage to their credit; additional income tax liability; and costs and expenses incurred to prevent or fight foreclosure.

Plaintiffs assert the following causes of action: Breach of Contract/Breach of Duty of Good Faith and Fair Dealing (Count I); Promissory Estoppel (Count II); violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count III); violation of Pennsylvania Fair

Credit Extension Uniformity Act (Count IV); and violation of the Fair Debt Collection Practices Act (Count V). Defendant Saxon has moved to dismiss all five counts against it, arguing primarily that it had no obligation under the TPP to provide a permanent modification, and that it did not violate the TPP in any way. We held oral argument on May 2, 2012.

## II.   LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."

Id. (quoting Twombly, 550 U.S. at 556).  In the end, we will dismiss a complaint if the factual

allegations in the complaint are not sufficient "to raise a right to relief above the speculative level."

Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and

Procedure § 1216, at 235-36 (3d ed. 2004)).

## III.   DISCUSSION

Saxon argues that the entire Complaint should be dismissed because the TPP was essentially

an application for a permanent modification and, as such, contained no enforceable promises.  Saxon

further argues that it complied with any promises in the TPP, and that all of its actions were

authorized by the TPP, by HAMP, or under the terms of Plaintiffs' mortgage.  Plaintiffs argue that

the TPP is an enforceable contract that required Saxon either to provide them with a permanent loan

modification if they qualified for one under HAMP, or to send them a timely written denial if they

did not qualify.[4]  Plaintiffs also allege, in the alternative, that the TPP contained clear promises that

are enforceable under the doctrine of promissory estoppel.  Finally, Plaintiffs assert claims under

---

[4]HAMP and TPPs have been the subject of scores of suits across the country.  Initially, plaintiffs attempted to bring claims directly under HAMP or as third-party beneficiaries to the contracts between the federal government and the loan servicers.  See Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 559 n.4 (7th Cir. 2012) (detailing the history of HAMP and TPP litigation).  These suits were mostly unsuccessful, as courts held that there was no private right of action under HAMP and that borrowers were not intended beneficiaries of the contracts between the government and the loan servicers.  Id.  In another set of cases, plaintiffs brought state law breach of contract claims, alleging that the loan servicers breached the TPP by not offering permanent loan modifications.  Id.  Cases in which the plaintiffs alleged that the TPP itself was a contract for permanent modification met with little success.  See, e.g., Bourdelais v. J.P. Morgan Chase, Civ. A. No. 10-670, 2011 WL 1306311, at *5-6 (E.D. Va. Apr. 1, 2011).  However, cases in which plaintiffs argued that the TPP entitled them to either an offer for a permanent modification or a written denial have survived motions to dismiss.  See, e.g., Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 352 (D. Mass. 2011).  Plaintiffs here have advanced this latter interpretation, arguing that Saxon was required by the terms of the TPP to offer them a permanent modification if they qualified under HAMP Guidelines, or to send them a written denial explaining why they did not qualify.

state and federal consumer protection laws arguing that Saxon engaged in deceptive and unfair conduct insofar as it strung them along, charged fees, and obstructed their efforts to obtain financial relief.[5]

A.    Breach of Contract (Count I)

Under Pennsylvania law, a plaintiff asserting a breach of contract claim must allege "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)).

1.    Existence of a Contract

Saxon argues that Plaintiffs' breach of contract claim fails to state a claim upon which relief may be granted because the TPP was part of the application process for a permanent modification, was not itself a contract for a permanent modification, and did not require Saxon to offer a permanent modification under any circumstances.  Plaintiffs counter that the TPP was an enforceable contract that obligated Saxon to either 1) offer them a permanent modification if they qualified, or 2) send them a timely written denial if they did not qualify.[6]

_____

[5]Saxon first argues that HAMP has no private right of action, and thus Plaintiffs' claims fail. Plaintiffs, however, have not brought a claim under HAMP, but rather are trying to enforce only the terms of the TPP. We decline to dismiss Plaintiffs' state law claims solely because HAMP contained no private cause of action. See Wigod, 673 F.3d at 581-82. Saxon also argues that Plaintiffs cannot incorporate HAMP guidelines into the terms of the TPP. The extent to which the parties intended HAMP guidelines to be reflected in the terms of the TPP is an issue better left for a later stage in the litigation.

[6]Plaintiffs argue in the alternative that, by the terms of the TPP, whether they qualified for permanent modification was determined *before* they entered into the TPP, and that by sending Plaintiffs a signed copy of the TPP, Saxon necessarily had already determined that Plaintiffs qualified for permanent modification.  This is how the Seventh Circuit interpreted the TPP at issue in Wigod, 673 F.3d at 563.

The introductory sentence of the TPP states, "If I am in compliance with this Trial Period Plan (the "Plan") and my representations in Section 1 continue to be true in all material respects, then the Lender will provide me with a Home Affordable Modification Agreement ("Modification Agreement"), as set forth in Section 3."  (TPP Intro.)  Later in the TPP, this apparent promise to provide a permanent modification is conditioned on whether Plaintiffs qualified for permanent modification:

> I understand that after I sign and return two copies of this Plan to the Lender, <u>the lender will send me a signed copy of this Plan, if I qualify for the Offer, or will send me written notice that I do not qualify for the Offer.</u>  This Plan will not take effect unless and until both I and the Lender sign it and the Lender provides me with a copy of this Plan with the Lender's signature.

(TPP Intro. (emphasis added).)  In the body of the TPP, all of the conditions precedent required to trigger Saxon's obligation to provide a permanent modification are set forth:

> If (1) my representations in Section 1 were and continue to be true in all material respects; (2) I comply with all the requirements in Section 2; (3) I provide the Lender with all required information and documentation; and (4) the Lender determines that I qualify, the Lender will send me a Modification Agreement for my signature . . . .

(TPP § 3.)  We therefore conclude that the TPP contains a clear promise that Saxon will provide Plaintiffs with a permanent modification if several conditions precedent are met.  However, it is clear that Saxon was only obligated to provide a permanent modification if Plaintiffs qualified.

---

However, as Saxon points out, the TPP in our case contains language not in the <u>Wigod</u> TPP, which indicates that whether Plaintiffs qualified was still to be determined.  For example, Plaintiffs' TPP states in Section 2.G that "the Lender will not be obligated or bound to make any modification of the Loan Documents if the Lender determines that I do not qualify."  Similarly, Section 3 states, "[i]f . . . the Lender determines that I qualify, the Lender will send me a Modification Agreement."

This language makes the TPP in our case materially different from the TPP in <u>Wigod</u>, and belies Plaintiffs' argument that merely by entering into the TPP with them, Saxon had necessarily determined already that Plaintiffs qualified for permanent modification.  The provisions in Section 2.G and Section 3 show that Saxon still had to determine whether the Plaintiffs qualified for permanent modification.

Saxon argues that the TPP cannot be interpreted as containing any promise for a permanent modification, whether Plaintiffs qualified or not.  Saxon relies on Sections 2.F and 2.G of the TPP, which state that there will be no permanent modification if "the Lender does not provide me a fully executed copy of the Plan and the Modification Agreement," (TPP § 2.F), and that there will be no permanent modification unless Plaintiffs "receive a fully executed copy of the Modification Agreement," (TPP § 2.G).[7]  Saxon argues that these provisions show that Saxon was not bound to provide Plaintiffs with a permanent modification under any circumstances, as Saxon had the power to trigger - or not trigger - what was essentially a condition precedent to a permanent modification: Plaintiffs' receipt of a final executed copy of a permanent modification contract.

We reject Saxon's interpretation of these provisions.  First, these provisions, rather than giving Saxon unfettered discretion as to its obligations under the TPP, simply set forth reasons why the permanent modification *would not occur automatically* upon the expiration of the three-month trial period.  One such reason is because Saxon had not sent Plaintiffs a contract for permanent modification.  Accord Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 563 (7th Cir. 2012) (stating

---

[7]Section 2.F of the TPP states:

If prior to the Modification Effective Date, (i) the Lender does not provide me a fully executed copy of the Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; (iii) the Lender determines that any of my representations in Section 1 were not true and correct as of the date I signed this Plan or are no longer true and correct during the Trial Period; or (iv) I do not provide all information and documentation required by the Lender, the Loan Documents will not be modified and this Plan will terminate. . . .

(TPP § 2.F.)

Similarly, Section 2.G states that "the Loan Documents will not be modified unless and until (i) I meet all of the conditions required for modification, (ii) I receive a fully executed copy of a Modification Agreement, and (iii) the Modification Effective Date has passed."  (TPP § 2.G.)

that the "more natural interpretation is to read the provision as saying that no permanent modification *existed*" until the loan servicer sent to the plaintiff the contract for permanent modification, and that this provision did not affect the loan servicer's obligation to provide this contract).

Second, Saxon's interpretation contradicts other provisions in the TPP that unequivocally state that Saxon will provide a permanent modification if Plaintiffs qualify and other conditions are met.  Saxon's interpretation of the select portions of Sections 2.F and 2.G "conflicts with the clear tenor of the remainder of the document and would render the other agreement promises illusory." Gaudin v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-1663, 2011 WL 5825144, at *4 (N.D. Cal. Nov. 17, 2011) (denying Saxon's motion to dismiss); see also Wigod, 673 F.3d at 563 ("Wells Fargo's proposed reading of Section 2 would nullify other express provisions of the TPP Agreement.").

Saxon offers two further arguments for why the TPP was not a binding contract: 1) it lacked material terms, and 2) it lacked consideration.  First, Saxon argues that the TPP lacked material terms and thus would be, at most, an unenforceable agreement to agree.  Saxon argues that the TPP did not include terms for a permanently modified loan, such as the principal amount of the modified loan, the loan's duration, and the interest rate, and it maintains that such terms are necessary to have an enforceable loan contract.  However, Plaintiffs do not argue that the TPP itself was the contract for a permanent modification, so Saxon's argument misses the mark.  See Bosque v. Wells Fargo Bank, N.A., 762 F. Supp. 2d 342, 352 (D. Mass. 2011) (rejecting defendant's argument that TPP is unenforceable because it lacks terms such as repayment dates, repayment amounts and interest rate, because "plaintiffs' theory is that the TPP is a contract governing the three-month trial period . . . [and the TPP] does establish clear terms with respect to the modified payments during the three-month period").  Moreover, at oral argument, Saxon appeared to acknowledge that the HAMP

Guidelines provided the means to determine these terms, should Plaintiffs qualify for a permanent modification.  Cf. Wigod, 673 F.3d at 565 (finding that HAMP provided the means to fill in the terms for permanent modification).  Accordingly, we reject Saxon's argument that the TPP is missing material terms.

Saxon also argues that the TPP lacked consideration and, thus, is not an enforceable contract. Consideration is, of course, a requirement for an enforceable contract.  Channel Home Ctrs., Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 299 (3d Cir. 1986) (citations omitted). "Consideration 'confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance, or return promise bargained for and given in exchange for the original promise.'"  Id. (quoting Curry v. Estate of Thompson, 481 A.2d 658, 661 (Pa. Super. Ct. 1984)).

Plaintiffs argue that the TPP required the Plaintiffs to make modified loan payments, provide extensive financial information that was not required under their original mortgage; make representations in a hardship affidavit concerning their personal circumstances; make payments into newly established escrow accounts; and undergo credit counseling at Saxon's request.  Plaintiffs further argue that, by making lower payments, they exposed themselves to the potential of late fees and other penalties should their application for permanent modification be rejected.  All of these promises and actions, Plaintiffs argue, constitute consideration.

We conclude that Plaintiffs' promise in the TPP to undergo credit counseling if Saxon so requested was consideration for Saxon's return promises.  (TPP § 1.F.)  Indeed, undergoing credit counseling confers both a benefit to Saxon and a detriment to Plaintiffs.  It is a benefit to Saxon because, once Plaintiffs have undergone counseling, they might be in a better position to manage their finances and continue making their mortgage payments, i.e., to continue paying Saxon, as

opposed to defaulting on their loan.  It is a detriment to Plaintiffs because it takes time and money

to undergo credit counseling.  Accordingly, the promise to undergo credit counseling upon request

of Saxon constitutes consideration for Saxon's promise to provide Plaintiffs with a permanent loan

modification or a timely denial.[8]  See Wigod, 673 F.3d at 564 (finding consideration in the plaintiff's

agreement to "open new escrow accounts, to undergo credit counseling (if asked), and to provide and

vouch for the truth of her financial information"); see also Fletcher v. OneWest Bank, FSB, 798 F.

Supp. 2d 925, 931-32 (N.D. Ill. 2011) (rejecting defendant's argument that lower monthly payments

were a windfall to plaintiff, because plaintiff "suffered some detriment" by incurring fees and likely

having to pay a higher total amount in the long run).

Accordingly, we conclude that the TPP is an enforceable contract.  Under its plain terms, the

TPP obligated Saxon to provide Plaintiffs with a permanent loan modification if Plaintiffs qualified,

or send Plaintiffs a written denial if they did not qualify.

## 2.    Breach

Saxon argues that Plaintiffs have failed to state a breach of contract claim upon which relief

may be granted because Plaintiffs do not allege that they qualified for a permanent modification, and

because Saxon eventually sent Plaintiffs a written denial explaining why they did not qualify.  Saxon

therefore argues that, even accepting all of the allegations in the Complaint as true, it is apparent that

it satisfied its obligations under the TPP.  Saxon further argues that Plaintiffs have not plausibly

alleged that it breached the implied covenant of good faith and fair dealing.

We do not agree that Plaintiffs have failed to allege that they qualified for a permanent

---

[8]We therefore need not reach Saxon's arguments that the other alleged promises cannot constitute consideration.  See Antkowiak v. TaxMasters, 455 F. App'x 156, 161 n.9 (3d Cir. 2011) (stating that only slightly more than a "mere peppercorn" is required for consideration).

modification.   Admittedly, the Complaint does not contain any explicit allegation that Plaintiffs

qualified for permanent modification under HAMP's Guidelines.   The Complaint does, however,

generally allege that Plaintiffs satisfied all conditions precedent under the TPP.   (Compl. ¶¶ 57, 60,

94.)   As Saxon acknowledges, whether Plaintiffs qualified was a condition precedent to permanent

modification, and under the Federal Rules of Civil Procedure, it is sufficient for a plaintiff to allege

generally that all conditions precedent were satisfied.   See Fed. R. Civ. P. 9(c).   Moreover, the

Complaint as a whole would not make any sense if Plaintiffs were not alleging that they were

qualified.   The Complaint alleges numerous times that Saxon breached the TPP by not offering

Plaintiffs a permanent modification which, as discussed, would only be the case if Plaintiffs

qualified.   (E.g. Compl. ¶¶ 59, 93.)   Accordingly, we find that the Complaint alleges that Saxon

breached the TPP by not offering Plaintiffs a permanent modification.

       We also find that the Complaint plausibly alleges in the alternative that, even if Plaintiffs

were not qualified for permanent modification, Saxon breached the TPP because it did not send

Plaintiffs a timely written denial explaining why they did not qualify.   The Complaint only alleges

that Plaintiffs were informed over the telephone that they did not qualify for permanent modification;

there are no allegations about any written denial from Saxon.   Accordingly, we conclude that the

Complaint adequately alleges, in the alternative, that Saxon breached the TPP by not sending a

written denial if Plaintiffs did not qualify for permanent modification.

       Saxon asserts that it did send Plaintiffs a written denial, and attaches to its Motion a copy of

a November 2010 letter addressed to Plaintiffs denying Plaintiffs' request for a permanent

modification and explaining why they did not qualify.   Saxon argues that, even though this notice

was sent over a year after Plaintiffs entered into the TPP in September 2009, it satisfied Saxon's

14

requirement to provide written notice.  This letter, however, cannot be considered on a Motion to

Dismiss, as it was not attached to the Complaint and it is not a public record or an undisputedly

authentic document on which the Complaint is based.  See Mayer, 605 F.3d at 230 (citation omitted).

Quite to the contrary, Plaintiffs stated at oral argument that they never received this letter.

Accordingly, we will not consider at this time whether this letter satisfied Saxon's obligations to

send written notice to Plaintiffs and we need not address the potentially crucial question of *when*

written notice had to be sent to Plaintiffs.  We therefore conclude that Plaintiffs have plausibly

alleged that Saxon breached the express terms of the TPP.

Plaintiffs also assert that Saxon breached the implied covenant of good faith and fair dealing

by acting in bad faith with respect to fulfilling its obligations under the TPP.  Saxon argues that

Plaintiffs are improperly attempting to use the implied covenant of good faith and fair dealing to read

into the TPP an unconditional promise to provide them with a permanent modification and a promise

to comply with HAMP regulations.

Under Pennsylvania law, "'[e]very contract imposes on each party a duty of good faith and

fair dealing in its performance and its enforcement.'"  Kaplan v. Cablevision of Pa., Inc., 671 A.2d

716, 722 (Pa. Super. Ct. 1996) (quoting Restatement (Second) of Contracts § 205).  Bad faith

includes: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering

of imperfect performance, abuse of a power to specify terms, and interference with or failure to

cooperate in the other party's performance."  Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super.

Ct. 1992) (citing Restatement (Second) of Contracts § 205(d)).

Plaintiffs argue that Saxon acted in bad faith by not diligently determining whether they

qualified and delaying further in informing them that they did not qualify.  Plaintiffs allege that

Saxon acted in bad faith to cause this delay, by failing to hire sufficient staff and by failing to accurately respond to their inquiries.  Plaintiffs further argue that Saxon has misunderstood their claim for breach of this implied covenant, as they are not arguing that the implied covenant obligated Saxon to provide them with a permanent modification or comply with other HAMP provisions.  We conclude that Plaintiffs have plausibly alleged that Saxon breached its implied duty to perform its TPP obligations in a diligent fashion by not informing them that they did not qualify for a permanent modification until over a year after Plaintiffs applied for a permanent modification, and months after actually determining that Plaintiffs did not qualify.  Indeed, as the TPP contains no express provision stating when Saxon had to send a written denial, the implied covenant of good faith and fair dealing may ultimately be the only aspect of the TPP that Saxon breached.

Accordingly, we find that the Complaint plausibly alleges that Saxon breached the TPP and we reject Saxon's arguments to the contrary.

3.    Damages

Finally, Saxon argues that Plaintiffs have not alleged plausible or non-speculative damages, and therefore the breach of contract claim must be dismissed.  Plaintiffs' alleged damages are: "payment of increased interest, longer loan payoff times, higher principle [sic] balances, deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments, damage to their credit, additional income tax liability, costs and expenses incurred to prevent or fight foreclosure, and other damages for breach of contract."  (Compl. ¶ 95.)

Plaintiffs allege that Saxon was obligated to send them a contract for permanent modification and that the loan modification they eventually received from Ocwen contained less favorable terms than a HAMP modification.  Alternatively, they allege that Saxon should have informed them sooner

16

that they would not be receiving a HAMP modification, and allege that they forewent other opportunities and incurred unnecessary fees and expenses while waiting to hear from Saxon.  We conclude that these allegations satisfy Plaintiffs' burden of alleging that Saxon's breach resulted in damages.  See Belyea v. Litton Loan Servicing, LLP, Civ. A. No. 10-10931, 2011 WL 2884964, at *9 (D. Mass. July 15, 2011) (stating that the plaintiff plausibly alleged damages for breach of a TPP "in terms of accrued . . . fees and charges in the period during which [defendant] allegedly should have tendered a permanent loan modification or at least a decision, and in terms of relief foregone by the Plaintiffs during that same period.").

Accordingly, we conclude that Plaintiffs have plausibly alleged that the TPP was an enforceable contract, that Saxon breached the TPP, and that Plaintiffs were damaged by that breach. Therefore, Saxon's Motion to Dismiss is denied as to Count I, the breach of contract claim.

B.     Promissory Estoppel (Count II)

In Count II of the Complaint, the promissory estoppel count, Plaintiffs assert that the TPP, even if not a binding contract, contains an enforceable promise to either provide them with a permanent modification or send them a written denial.  Under Pennsylvania law, a promissory estoppel claim requires Plaintiffs to allege that:  1) Saxon made a promise that it should have reasonably expected to induce action or forbearance on the part of Plaintiffs; 2) Plaintiffs actually took action or refrained from taking action in reliance on the promise; and 3) injustice can be avoided only by enforcing the promise.  See Edwards v. Wyatt,  335 F.3d 261, 277 (3d Cir. 2003) (citing Crouse v. Cyclops Indus., 745 A.2d 606, 610 (Pa. 2000)).

Saxon's arguments for dismissal of the promissory estoppel claim echo its arguments for dismissal of the breach of contract claim; namely, it argues that the TPP was just an application for

a permanent modification and did not contain the promises that Plaintiffs allege it containted.  Saxon acknowledged at oral argument that, if we deny its Motion to Dismiss as to the breach of contract claim, it necessarily follows that we deny the Motion as to the promissory estoppel claim.  Having refused to dismiss the contract claim, we therefore deny Saxon's Motion to Dismiss as to Count II.  See Fletcher, 798 F. Supp. 2d at 932-33 (finding that plaintiff had stated a promissory estoppel claim based on a TPP, and that this "claim is actually stronger [than the contract claim] because it is not clear from the TPP that [defendant] promised an answer to [plaintiff's] application by any date certain"); see also Wigod, 673 F.3d at 566 (finding that plaintiff adequately alleged claim for promissory estoppel in addition to claim for breach of the TPP).

      C.      Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count III)

Plaintiffs allege that Saxon violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law (the "UTPCPL") by: 1) misrepresenting to them the status of their loan modification application and informing them to continue to make modified payments despite having already determined that they did not qualify under HAMP; 2) charging late fees during the time period when Plaintiffs made the lower payments; and 3) failing to provide the Commonwealth with the information needed for Plaintiffs to get a HEMAP loan.

The UTPCPL, in its catchall provision, bars engaging in "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce.  73 Pa. Stat. Ann. § 201-2(4)(xxi); Toy v. Metro. Life Ins. Co., 928 A.2d 186, 190 n.4 (Pa. 2007).  To state a claim under the UTPCPL, a plaintiff must allege that he "'justifiably relied on the defendant's wrongful conduct or representation and that he suffered harm as a result of the reliance.'"  Molley v. Five Town Chrysler, Inc., Civ. A. No. 07-5415, 2009 WL 440292, at *2 (E.D.

Pa. Feb. 18, 2009) (quoting Hunt v. U.S. Tobacco Co., 538 F.3d 217, 222 (3d Cir. 2008)).  A

plaintiff may allege deception, as opposed to common law fraud, to set forth an actionable claim

under the UTPCPL.  Flores v. Shapiro, 246 F. Supp. 2d 427, 432 (E.D. Pa. 2002).

Saxon first argues that the UTPCPL claim should be dismissed because Plaintiffs have not

alleged a deceptive act, insofar as charging them late fees and denying a permanent modification was

wholly consistent with the terms of the TPP and Plaintiffs' mortgage.  However, Saxon has ignored

the allegations relating to Saxon's statements that Plaintiffs were still in the HAMP program and

should continue to make modified payments, even though Saxon had already decided against

offering a permanent modification.  Moreover, Plaintiffs have alleged that Saxon failed to provide

the Commonwealth with necessary documents and that this failure prevented Plaintiffs from

obtaining a loan under HEMAP.  We find that these allegations plausibly allege that Saxon

committed a deceptive or fraudulent act.  See Wallace v. Pastore, 742 A.2d 1090, 1093 (Pa. Super.

Ct. 1999) (citation omitted) ("The UTPCPL must be liberally construed to effect the law's purpose

of protecting consumers from unfair or deceptive business practices.").

Saxon next argues that Plaintiffs' claim under UTPCPL is barred by the economic loss

doctrine because Plaintiffs have not alleged damages under the UTPCPL claim that are distinct from

the breach of contract claim.  The economic loss doctrine "'prohibits plaintiffs from recovering in

tort economic losses to which their entitlement flows only from a contract.'"  Werwinski v. Ford

Motor Co., 286 F.3d 661, 671 (3d Cir. 2002) (quoting Duquesne Light Co. v. Westinghouse Elec.

Corp., 66 F.3d 604, 618 (3d Cir. 1995)).  "Like the gist of the action doctrine, the economic loss

doctrine is designed to 'maintain[] the separate spheres of the law of contract and tort.'"  Kimberton

Healthcare Consulting, Inc. v. Primary PhysicianCare, Inc., Civ. A. No. 11-4568, 2011 WL 6046923,

19

at *7 (E.D. Pa. Dec. 6, 2011) (quoting Duquesne Light Co., 66 F.3d at 620).[9]  Under the economic

loss doctrine, "a plaintiff should be limited to a contract claim 'when loss of the benefit of a bargain

is the plaintiff's sole loss.'" Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc., 247 F.3d 79,

104 (3d Cir. 2001) (quoting Duquesne Light Co., 66 F.3d at 618).

> As we have explained,

> Like the gist of the action doctrine, the rationale of the economic loss rule is that tort law is not intended to compensate parties for losses suffered as result of a breach of duties assumed only by agreement. [Sun Co. v. Badger Design & Constructors, Inc., 939 F.Supp. 365, 371 (E.D. Pa. 1996)]. Compensation in such cases requires an analysis of damages which were in the contemplation of the parties at the origination of the agreement, an analysis within the sole purview of contract law.  The policy consideration underlying tort law is the protection of persons and property from loss resulting from injury, while the policy consideration underlying contract law is the protection of bargained for expectations. Thus in the light of these distinctions, to recover in tort a plaintiff must allege facts showing a breach of some duty imposed by law, rather than the parties' contract.  In other words, there must be a showing of harm that is distinct from the disappointed expectations evolving solely from an agreement.  Id. (citing Auger v. The Stouffer Corp., No. 93-2529,1993 WL 364622 at *2 (E.D. Pa. August 31,1993)).

Sunburst Paper, LLC v. Keating Fibre Int'l, Inc., Civ. A. No. 06-3959, 2006 WL 3097771, at *3 n.3

(E.D. Pa. Oct. 30, 2006) (emphasis added).

> Saxon argues that Plaintiffs have not alleged that they suffered any damages distinct from

those arising from the breach of contract claim, and thus the economic loss doctrine bars the

---

[9]The overlap between the economic loss doctrine and the gist of the action doctrine is substantial.  "The distinction between the gist of the action and economic loss doctrines is largely one of pedigree.  The economic loss doctrine 'developed in the context of courts' precluding products liability tort claims in cases where one party contracts for a product with another party and the product malfunctions, injuring only the product itself.'" Kimberton Healthcare, 2011 WL 6046923, at *7 (quoting Bohler-Uddeholm America, 247 F.3d at 104 n.11).  The economic loss doctrine applies to claims under the UTPCPL. Werwinski, 286 F.3d at 681.  In contrast, the gist of the action doctrine does not appear to apply to UTPCPL claims.  See Clark v. EMC Mortg. Corp., Civ. A. No. 08-1409, 2009 WL 229761, at *6 (E.D. Pa. Jan. 29, 2009) (finding no case law to support the application of the gist of the action doctrine to the UTPCPL).

UTPCPL claim.  Plaintiffs argue that 1) the economic loss doctrine applies only in cases in which a product is damaged, such as products liabilities cases, and 2) even if the economic loss doctrine does apply, they have alleged damages under the UTPCPL claim that are distinct from those under the breach of contract claim.

We do not agree that the economic loss doctrine applies only in products liability cases.  To the contrary, the economic loss doctrine has been extended beyond the context of the product liability cases in which it arose, notably to cases involving fraudulent representations concerning a party's performance of a service contract.  See Ferki v. Wells Fargo Bank, N.A., Civ. A. No. 10-2756, 2010 WL 5174406, at *10 (E.D. Pa. Dec. 20, 2010); Sun Co., 939 F. Supp. at 372.  Thus, we reject Plaintiffs' first argument.

To resolve Plaintiffs' second argument, we must consider whether Plaintiffs have alleged "a showing of harm that is distinct from the disappointed expectations evolving solely from an agreement."  Sunburst Paper, 2006 WL 3097771, at *3 n.3 (citation omitted).  At the same time, we must exercise "caution . . . in dismissing a tort action on a motion to dismiss because whether tort and contract claims are separate and distinct can be a factually intensive inquiry."  Haymond v. Lundy, Civ. A. Nos. 99-5015, 99-5048, 2000 WL 804432, at *8 (E.D. Pa. June 22, 2000) (citations omitted); see also Kimberton Healthcare, 2011 WL 6046923, at *7-8 (declining to determine whether gist of action and economic loss doctrine bar a claim when deciding a motion to dismiss).  We cannot, based solely on the Complaint, find that Plaintiffs have not suffered damages as a result of Saxon's alleged deceptive conduct that are distinct from any breach of the TPP.  At the minimum, Plaintiffs have alleged that Saxon failed to provide the paperwork that Plaintiffs needed to get a HEMAP loan, and any damages that flowed from Plaintiffs' inability to get a HEMAP loan are likely

21

different than the damages from Saxon's failure to perform its obligations under the TPP.  We therefore decline, at this time, to conclude that Plaintiffs' UTPCPL claim is barred by the economic loss doctrine.  Saxon's Motion to Dismiss is thus denied with respect to Count III.

      D.     Pennsylvania Fair Credit Extension Uniformity Act (Count IV) and Fair Debt Collection Practices Act (Count V)

    The Fair Debt Collection Practices Act ("FDCPA") and its state analog, the Pennsylvania Fair Credit Extension Uniformity Act ("FCEUA"), both bar debt collectors from engaging in unfair debt collection practices.  Saxon argues that both of these claims should be dismissed because mortgage servicers who begin servicing a loan before it goes into default are exempt from liability under both acts.  See Perry v. Stewart Title Co., 756 F.2d 1197, 1208 (5th Cir. 1985) ("The legislative history of [the FDCPA] indicates conclusively that a debt collector does not include the consumer's creditors, a mortgage servicing company, or an assignee of a debt, as long as the debt was not in default at the time it was assigned." (citations omitted)); see also 73 Pa. Cons. Stat. Ann. § 2270.3 (stating that an entity that begins servicing a loan before it goes into default is not liable under the FCEUA).  In this case, the Complaint alleges that Saxon was the original mortgage servicer for Plaintiffs, indicating that Saxon was servicing Plaintiffs' mortgage before it went into default.  At oral argument, Plaintiffs agreed that their claims against Saxon under the FCEUA and the FDCPA should be dismissed on that basis.  Accordingly, we grant Saxon's Motion as to Counts IV and V and dismiss those claims against Saxon.[10]

---

    [10]Plaintiffs requested leave to amend in the event we dismiss any of their claims.  However, given that Plaintiffs conceded that they cannot state a claim against Saxon under the FCEUA and the FDCPA, the only claims we are dismissing, no amendment is warranted.

**IV.      CONCLUSION**

For the foregoing reasons, Saxon's Motion to Dismiss is denied in part and granted in part.

The Motion is denied as to Counts I, II, and III.  The Motion is granted as to Counts IV and V, and

those counts are dismissed insofar as they assert claims against Saxon.  Saxon shall have 20 days

from the date of this Memorandum to file an answer to Plaintiffs' Complaint.  An appropriate Order

follows.


BY THE COURT:


/s/ John R. Padova_____
John R. Padova, J.

23