IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

LISA and SCOTT CAVE, on behalf of : 
themselves and all others similarly situated :     CIVIL ACTION
    :
v.     :
    :
SAXON MORTGAGE SERVICES, INC. and : 
OCWEN LOAN SERVICING, LLC     :     NO. 11-4586

## MEMORANDUM

**Padova, J.**                                       **December 12, 2012**

Plaintiffs bring this putative class action for breach of contract and other claims arising out of Defendant Ocwen Loan Servicing, LLC's ("Ocwen") failure to permanently modify home mortgage loans after providing Plaintiffs with a temporary modification, and its failure to adequately disclose loan terms in Ocwen's in-house modification loan agreement. Presently before the Court is Ocwen's Motion to Dismiss. For the reasons below, we grant the Motion in part and deny it in part.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.      Plaintiffs' Temporary Loan Modification Contract with Saxon

Plaintiffs' Complaint alleges the following facts. In August 2009, after incurring unexpected medical expenses for one of Plaintiffs' parents, Plaintiffs applied to Saxon Mortgage Services, Inc. ("Saxon"), their mortgage servicer, for a Home Affordable Modification Program ("HAMP") mortgage modification.[1] (Compl. ¶ 52.) In September 2009, in support of their

---

[1]Under HAMP, borrowers can apply for a permanent loan modification to get a reduced monthly payment. (Compl. ¶ 1.) Defendants Saxon and Ocwen are loan servicers who entered into agreements with the federal government in which they agreed to comply with the "guidelines, procedures, and deadlines" for issuing HAMP loans. (Id. ¶¶ 28-30.) After a borrower applies for permanent modification, loan servicers are required under HAMP regulations to determine, based on financial information submitted by the borrower, whether that

application, Plaintiffs sent Saxon a package containing all requested financial information and documents. (Id.) After receiving these documents, Saxon sent Plaintiffs a loan modification package, which included a proposed temporary loan modification contract ("TPP") providing for a trial payment period beginning on September 1, 2009, and ending on November 30, 2009, and a modified monthly payment of $1,007.50. (Id. ¶ 53.)

Plaintiffs were pre-qualified for their TPP on the basis of verified financial information. (Id.) Plaintiffs executed the TPP and promptly returned it to Saxon. (Id. ¶ 56.) Plaintiffs fully performed all of their obligations under the TPP, including making all payments on time and providing additional copies of previously supplied documents as requested by Saxon. (Id. ¶ 57.) In addition to making the trial period payments, the TPP also required Plaintiffs to: "(1) provide extensive financial information that was not required under their original mortgages; (2) make representations in a hardship affidavit concerning their changed financial circumstances; (3) make payments into newly established escrow accounts; and (4) undergo credit counseling if Defendants so requested." (Id. ¶ 58 (footnotes omitted.))

In April 2010, months after the trial period ended, Plaintiffs attempted to pay school and other taxes on their property, but were informed that these taxes had already been paid. (Id. ¶

borrower is eligible for a loan modification which would reduce the borrower's monthly loan payment to 31% of the borrower's gross monthly income. (Id. ¶¶ 31-32.)

Before providing a borrower with a permanent modification, a loan servicer and a borrower enter into a 3-month trial period, in which the borrower makes lower monthly payments towards her mortgage. (Id. ¶ 49.) The terms of the trial period are governed by a form contract entitled "HAMP TPP." (Id. ¶ 48.) The TPP states that if: (1) the borrower's representations of her financial state continue to be true; (2) the borrower complies with the terms of the temporary payment plan; (3) the borrower provides all required documentation; and (4) the Lender determines the borrower qualifies, then the Lender will send the borrower a permanent modification agreement. (Id.)

61.) Saxon had never told them that it would pay taxes on the property and that it was escrowing funds for this purpose. (Id.) Plaintiffs subsequently received an Escrow Shortage Statement from Saxon, dated July 16, 2010. (Id. ¶ 62.) Plaintiffs called Saxon and were told by a customer service representative to disregard the statement, that their loan modification was current, and that they should continue to make the modified monthly payments of $1,007.50. (Id.)

On October 14, 2010, Plaintiffs received from Saxon an Act 91 Notice which stated that they were past due in the amount of $23,210.64, including late fees, escrow charges, and inspection charges, with respect to the period November 1, 2009–October 12, 2010. (Id. ¶ 63.) Plaintiffs called Saxon and were told by three representatives that Saxon had removed Plaintiffs from HAMP on April 29, 2010, without notice to Plaintiffs and despite the fact that they had made all payments on time. (Id. ¶ 64.) None of these representatives could explain the basis for the Act 91 Notice. (Id.) Saxon claims that it removed Plaintiffs from HAMP because "Plaintiffs' income exceeded the ceiling of 31 percent of current housing expense." (Id. ¶ 67.)

On October 26, 2010, as required by the Act 91 Notice, Plaintiffs had a meeting with a certified credit and housing counselor and, with her assistance, Plaintiffs applied for a Homeowners' Emergency Mortgage Assistance Program ("HEMAP") loan through the Commonwealth of Pennsylvania in order to obtain funds to discharge the alleged past due amounts owed to Saxon. (Id. ¶ 65.) Plaintiffs qualified for the HEMAP loan, but did not obtain the loan because Saxon failed to provide required information to the Commonwealth. (Id. ¶ 66.)

B. Transfer of Servicing to Ocwen

By letter dated April 21, 2011, Plaintiffs were advised that Saxon was transferring the servicing of their mortgage to Ocwen, effective May 16, 2011. (Id. ¶ 68.) Ocwen informed

Plaintiffs that they would need to apply for another HAMP modification, and if they did not qualify for HAMP, they would be considered for an in-house modification. (Id. ¶ 69.) Plaintiffs applied to Ocwen for a HAMP modification, which Ocwen denied. (Id.)

By letter dated June 28, 2011, Ocwen offered Plaintiffs an in-house modification ("In-House Modification") on terms that were significantly worse than the terms of the HAMP modification offered in the TPP Plaintiffs had previously obtained from Saxon. (Id. ¶ 70.) The In-House Modification provided for an initial monthly payment of $1,285.39, of which $1,000.02 went to principal and interest payments, and $285.37 to escrow. (Id.) Upon modification, the annual rate of interest on Plaintiffs' mortgage would be 2% until August 2016, when it would increase to 4.5% until the loan reached maturity. (Id.) Under the terms of the In-House Modification, even if Plaintiffs made all payments in full and on time, their loan would not be paid in full by the final payment date. (Id.) Instead, a single balloon payment in an unspecified amount would be due on December 1, 2035. (Id.) The In-House Modification failed to include an amortization schedule or a means for calculating the balloon payment. (Id.) Plaintiffs accepted the proposed In-House Modification because they had been advised that their property was in foreclosure. (Id. ¶ 71.)

Plaintiffs' injuries from Defendants' breach of the TPP and other actions include: "payment of increased interest; longer loan payment times; higher principle [sic] balances; deterrence from seeking other remedies to address their default and/or unaffordable mortgage payments; damage to their credit; additional income tax liability; and costs and expenses incurred to prevent or fight foreclosure." (Id. ¶¶ 95, 103, 112.)

C.    Class Allegations

Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), on behalf of themselves and a Class consisting of all Pennsylvania homeowners whose loans were serviced by Defendants and who, since April 13, 2009, entered into a TPP, made all payments as required, and complied with requests for documentation and:

> (1) Did not receive a permanent modification and did not receive a timely written notification explaining the reason for the denial of the modification (the "Denied Class") (Id. ¶ 73.a);

> (2) Were improperly reported to credit reporting agencies as delinquent during the TPP (the "Credit Reporting Class")  (Id. ¶ 73.b);

> (3) Were improperly placed in foreclosure and/or charged for various foreclosure-related fees (the "Foreclosure Class.") (Id. ¶ 73.c.)

The Complaint asserts claims for Breach of Contract and Breach of Duty of Good Faith and Fair Dealing (Count I); Promissory Estoppel (Count II); Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count III); Violation of Pennsylvania Fair Credit Extension Uniformity Act (Count III); and Violation of the Fair Debt Collection Practices Act (Count IV).[2]  Ocwen has moved to dismiss the Complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6).

## II.    LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents."

---

[2]The Complaint labels both the UTPCPL and Fair Credit Extension Uniformity Act claims as Count III.

Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)). We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)). Legal conclusions, however, receive no deference, and the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986) (cited with approval in Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Twombly, 550 U.S. at 555 (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). The "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Twombly, 550 U.S. at 570). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Twombly, 550 U.S. at 556). In the end, we will dismiss a complaint if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555 (citing 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 235-36 (3d ed. 2004)).

## III. DISCUSSION

Ocwen argues that the Complaint should be dismissed because Saxon, rather than Ocwen, entered into the TPP with Plaintiffs, and Ocwen is not liable for Saxon's acts under the doctrine

of successor liability. Further, Ocwen argues that the Complaint fails to allege an independent basis on which to assert that Ocwen breached state and federal consumer protection laws.

A. Breach of Contract and Breach of the Implied Duty of Good Faith and Fair Dealing (Count I)

Ocwen argues that we should dismiss Plaintiffs' claim against it for breach of contract and breach of the implied duty of good faith and fair dealing because Ocwen did not enter into a TPP with Plaintiffs, the Complaint does not allege the existence of any consideration that would support a finding that it had an obligation to enter into a HAMP modification with Plaintiffs, and Plaintiffs suffered no damages caused by Ocwen.

Privity of contract is generally required for enforcement of a contractual agreement.[3] Unique Techs., Inc. v. Micro-Stamping Corp., Civ. A. No. 02-6649, 2003 WL 21652284, at *2 (E.D. Pa. Apr. 15, 2003). Privity is required because "a party to a contract does not bec[o]me liable for a breach thereof to one who is not a party thereto." Evans v. Otis Elevator Co., 168 A.2d 573, 575 (Pa. 1961). Further, "[i]n the absence of a contractual relationship between [the parties], there is no basis for asserting the breach of good faith and fair dealing doctrine." Southeastern Pa. Transp. Auth. v. Holmes, 835 A.2d 851, 859 (Pa. Commw. Ct. 2003).

---

[3]In order to state a plausible claim for breach of contract, the Complaint must allege "'(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract[,] and (3) resultant damages.'" Ware v. Rodale Press, Inc., 322 F.3d 218, 225 (3d Cir. 2003) (alteration in original) (quoting CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999)). In order to state a claim for breach of the implied duty of good faith and fair dealing, the Complaint must allege bad faith in the performance of contractual duties, which includes: "evasion of the spirit of the bargain, lack of diligence and slacking off, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance." Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (citing Restatement (Second) of Contracts § 205(d)).

Ocwen maintains that the Complaint does not allege a plausible breach of contract claim against it because Ocwen did not enter into a TPP with Plaintiffs. Plaintiffs do not argue that Ocwen entered into a TPP with Plaintiffs, but rather assert that Ocwen's liability for these claims is based on successor liability, and thus, Plaintiffs' harm "resulted from Ocwen's predecessor's breach of the Cave's TPP." (Pls.' Mem. at 13.) Therefore, Plaintiffs' claims for breach of contract and breach of the implied duty of good faith and fair dealing rest upon Ocwen's status as Saxon's successor-in-interest.

The Complaint alleges that Ocwen breached its contract with Plaintiffs by failing to offer Plaintiffs permanent HAMP modifications if they qualified and performed pursuant to the terms of the TPP (Compl. ¶ 93), or to send them a timely written denial if they did not qualify (see id. Ex. A). The Complaint further alleges that Ocwen breached its implied duty of good faith and fair dealing by failing to perform under the TPP after Plaintiffs performed all conditions required under the TPP.[4] (Id. ¶ 93.) Plaintiffs rely on the following allegation in the Complaint to support their assertion that Ocwen is Saxon's successor-in-interest for these alleged breaches: "As of May 16, 2011, the servicing of Plaintiffs' mortgage was transferred from Saxon to Ocwen, together with all rights, title, interests and obligations arising under Saxon's contracts with Plaintiffs, including but not limited to the TPP Contract that Saxon entered into with Plaintiffs." (Compl. ¶ 11.)

---

[4]Our May 30, 2012 Memorandum concluded that the Complaint plausibly alleges a claim for breach of contract and breach of the implied duty of good faith and fair dealing against Saxon based on Saxon's failure to offer Plaintiffs a permanent HAMP modification and failure to send Plaintiffs a timely denial under the terms of the TPP. Cave v. Saxon Mortg. Servs., Inc., Civ. A. No. 11-4586, 2012 WL 1957588, at *4-8 (E.D. Pa. May 30, 2012).

Under Pennsylvania law, the general rule with respect to successor liability is that "'when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property.'" Schmidt v. Boardman Co., 958 A.2d 498, 504 (Pa. Super. Ct. 2008) (quoting Cont'l Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1291 (Pa. 2005)); see also United States v. Sunoco, Inc., 637 F. Supp. 2d 282, 287 (E.D. Pa. 2009) (noting that in Pennsylvania "the general rule is that a buying entity does not assume the liabilities of a selling entity merely by buying all of its assets") (citing Berg Chilling Sys., Inc. v. Hull Corp., 435 F.3d 455, 464 (3d Cir. 2006)). However, successor liability may exist when one corporation transfers all of its assets to another, if the plaintiff can establish that the transferee corporation "expressly or impliedly agrees to assume" the liabilities of the transferor corporation. Schmidt, 958 A.2d at 504 (quoting Childers v. Power Line Equip. Rentals, 681 A.2d 201, 212 (Pa. 1996)).

Ocwen argues that the Complaint's allegation of a "transfer" of liability is merely a "threadbare recitation" of successor liability that fails under the standards of a Rule 12(b)(6) Motion. (Def.'s Reply Mem. at 6.) Ocwen further argues that Ocwen cannot be Saxon's successor-in-interest because Saxon exists as a separate corporation. Plaintiffs maintain that the Complaint alleges that Ocwen expressly assumed Saxon's liabilities under Plaintiffs' TPP when Ocwen acquired the rights to service Plaintiffs' mortgage.

The Complaint alleges only that Saxon's right to service Plaintiff's mortgage was transferred to Ocwen as of May 16, 2011. (Id.) The Complaint does not allege that all of Saxon's assets—or any assets other than the right to service Plaintiffs' mortgage—were sold or transferred to Ocwen, as required to state a claim based on successor liability under Pennsylvania

9

law.  See Schmidt, 958 A.2d at 504 (explaining that there is no successor liability unless an exception applies "when one company sells or transfers all of its assets" (emphasis added)); Hyjurick v. Commonwealth Land Title Ins. Co., Civ. A. No. 11-1282, 2012 WL 1463633, at *4 n.2 (M.D. Pa. Apr. 27, 2012) (noting that a transferee corporation "cannot be [the transferor's] successor if [the transferor] exists as a separate corporation"); see also Aluminum Co. of Am. v. Beazer East, Inc., 124 F.3d 551, 555, 565-57 (3d Cir. 1997) (recognizing successor liability where the transferee received all of the transferor's assets).  Therefore, the Complaint fails to sufficiently allege that Saxon transferred all of its assets to Ocwen, as required to state a claim against Ocwen based on successor liability under Pennsylvania law.[5]  Further, Saxon is a party to this action, and Plaintiffs may assert their claims for Saxon's actions with respect to Plaintiffs' TPP against Saxon itself.  Accordingly, we grant Ocwen's Motion as to Plaintiffs' breach of contract and breach of the implied duty of good faith and fair dealing claim.[6]

> B.     Promissory Estoppel (Count II)

Ocwen argues that Plaintiffs' promissory estoppel claim against it should be dismissed because Saxon, not Ocwen, made the promises in the TPP that Plaintiffs seek to enforce, and

---

[5]Ocwen also contends that it specifically disclaimed successor liability in its subservicing agreement with Saxon, by which the servicing of Plaintiffs' mortgage was transferred from Saxon to Ocwen.  The Subservicing Agreement was not attached as an exhibit to the Complaint, but rather was attached to Ocwen's reply memorandum.  Because the Complaint fails to allege a threshold showing of the elements of successor liability, we need not consider the terms of the Subservicing Agreement at this time.

[6]Plaintiffs have requested leave to amend their Complaint to cure any deficiency in pleading.  "[I]f a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."  Phillips v. Cnty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004)).  We conclude that there are no facts which would support a finding of successor liability, and, therefore, a curative amendment would be futile.

because Ocwen is not Saxon's successor-in-interest. Plaintiffs concede that their promissory estoppel claim against Ocwen is based solely on successor liability. (Pls.' Mem. at 15.) As we explained above, the Complaint does not adequately allege that Ocwen is Saxon's successor-in-interest. As a result, just as the Complaint fails to state a claim for breach of contract based on successor liability, the Complaint similarly fails to state a promissory estoppel claim against Ocwen as Saxon's successor. Accordingly, we grant Ocwen's Motion as to Plaintiffs' promissory estoppel claim.

C.     Violation of the Pennsylvania Fair Credit Extension Uniformity Act (Count III)

Ocwen argues that we should dismiss Plaintiff's claim against it under the Pennsylvania Fair Credit Extension Uniformity Act, 73 Pa. Stat. § 2270.1 et seq. ("FCEUA"), because "purchase money mortgages" do not qualify as "debt," and the Complaint fails to allege that Ocwen engaged in conduct "in connection with the collection of any debt" under the statute. 73 Pa. Stat. § 2270.3. Plaintiffs do not oppose Ocwen's Motion to dismiss their FCEUA claim. (Pls.' Mem. at 1 n.1.) Accordingly, we grant Ocwen's Motion as to Plaintiffs' FCEUA claim.

D.     Violation of the Fair Debt Collection Practices Act (Count IV)

Ocwen argues that we should dismiss Plaintiffs' claim against it under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, et seq. ("FDCPA"), because Ocwen was not a debt collector as defined by the FDCPA, and because the Complaint does not allege that it used prohibited means to collect a debt from Plaintiffs. The FDCPA prohibits a debt collector's "false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e. Certain "unfair practices" are prohibited under the FDCPA, including "[t]he collection of any amount . . . unless such amount is expressly authorized by the agreement

creating the debt or permitted by law," 15 U.S.C. § 1692f(1), and the "false representation of--(A) the character, amount, or legal status of any debt." 15 U.S.C. 1692e(2). Communications between lenders and debtors are analyzed from the perspective of the "least sophisticated debtor," which is "lower than the standard of a reasonable debtor" in that "'[a] communication that would not deceive or mislead a reasonable debtor might still deceive or mislead the least sophisticated debtor.'" Rosenau v. Unifund Corp., 539 F.3d 218, 221 (3d Cir. 2008) (quoting Brown v. Card Serv. Ctr., 464 F.3d 450, 454 (3d Cir. 2006)) (remaining citation omitted). "'[T]he basic purpose of the FDCPA [is to] to protect all consumers, the gullible as well as the shrewd.'" Id. (quoting Brown, 464 F.3d at 454).

Ocwen maintains that the FDCPA claim should be dismissed because the Complaint does not allege that Plaintiffs' loan was in default when its servicing rights were transferred from Saxon, meaning that Ocwen was not a "debt collector" under the FDCPA. The FDCPA excludes from the definition of a "debt collector" "any person collecting or attempting to collect any debt owed or due another to the extent such activity . . . concerns a debt which was not in default at the time it was obtained." 15 U.S.C. § 1692a(6)(F). The Third Circuit has similarly noted that "an assignee of an obligation is not a 'debt collector' if the obligation is not in default at the time of the assignment." Pollice v. Nat'l Tax Funding, L.P., 225 F.3d 379, 403 (3d Cir. 2000) (footnote and citations omitted); see also Taggart v. Wells Fargo Home Mortg., Inc., Civ. A. No. 10-843, 2012 WL 4462787, at *4 (E.D. Pa. Sept. 27, 2012) ("Loan servicers are not 'debt collectors' under the FDCPA unless the debt being serviced was in default at the time it was obtained by the servicer.").

The Complaint alleges that Plaintiffs made modified payments under the TPP beginning on September 1, 2009, through October 12, 2010. (Compl. ¶¶ 53, 63.) While the Complaint does not specifically allege when Plaintiffs' mortgage went into default, it does allege that on October 14, 2010, the mortgage was past due in the amount of $23,210.64. (Id. ¶ 63.) On May 16, 2011, Plaintiffs' mortgage servicing rights were transferred to Ocwen. (Id. ¶ 68.) Shortly thereafter, Plaintiffs were advised that their property was in foreclosure. (Id. ¶ 71.) There is no indication in the Complaint that Plaintiffs paid off their arrearage prior to the transfer of their mortgage servicing rights on May 16, 2011. It is thus reasonable to infer that Plaintiffs' mortgage was in default prior to the transfer of servicing rights to Ocwen. Therefore, the Complaint pleads sufficient facts to allege that Ocwen is a "debt collector" under the FDCPA.

Ocwen also argues that we should dismiss the FDCPA claim against it because we dismissed Plaintiffs' FDCPA claims against Saxon, and Ocwen "stands in Saxon's shoes and is exempt from such claims."[7] (Def.'s Reply Mem. at 16.) The Complaint alleges that Ocwen violated the FDCPA by "misrepresent[ing] the amount and legal status of Plaintiffs' mortgage debt" (Compl. ¶ 128), and that Ocwen's In-House Modification contained deceptive representations of Plaintiffs' debt (id. ¶ 70). Thus, the Complaint's allegations against Ocwen under the FDCPA relate to Ocwen's independent acts under the terms of its In-House Modification. Therefore, Ocwen's argument that it "stands in Saxon's shoes," and is therefore exempt from any violation of the FDCPA, lacks merit.

---

[7]We dismissed Plaintiffs' claims against Saxon under the FDCPA because the FDCPA exempts mortgage servicers who begin servicing a loan before it goes into default. Cave, 2012 WL 1957588, at *11.

Ocwen further argues that the FDCPA claim should be dismissed against it because it did not offer misleading terms in the In-House Modification. The Complaint alleges that the In-House Modification charges Plaintiffs 2.0% interest until August 1, 2016, after which the interest rate will increase to 4.5%, and Plaintiffs will have to make a balloon payment on December 1, 2035. (Id.) Moreover, even if Plaintiffs make all of their payments on time, their loan will not be paid off by the final payment date. (Id.) The Balloon Disclosure provision does not reveal the amount of the balloon payment, how such payment will be calculated, or an amortization schedule. (Id.) It is likely that these representations and omissions could "deceive or mislead the least sophisticated debtor" who could then sign the modification agreement without fully understanding its implications on her debt. Rosenau, 539 F.3d at 221. Plaintiffs may not have understood how to calculate the balloon payment, or how their payments would change over the duration of the modification agreement.[8] The Complaint's allegation that Ocwen failed to provide this information is therefore sufficient to state a claim based on a "false, deceptive, or misleading representation" of Plaintiffs' debt under the FDCPA. 15 U.S.C. § 1692e. Accordingly, we deny Ocwen's Motion as to Plaintiffs' FDCPA claim.

E.     Violation of the UTPCPL (Count III)

Ocwen argues that we should dismiss Plaintiffs' claim against it for violation of the UTPCPL, 73 Pa. Stat. § 201-1 et seq., because Ocwen is not liable for Saxon's alleged violation of the UTPCPL, Ocwen did not independently violate the UTPCPL, and the Complaint fails to adequately allege justifiable reliance and ascertainable loss as required to state a claim under the

---

[8]Because the FDCPA protects "the gullible as well as the shrewd," Rosenau, 539 F.3d at 221 (quotations and citations omitted), the FDCPA does not place the burden on Plaintiffs to make inquiries, even if they would be reasonable, into the terms of the In-House Modification.

UTPCPL. The UTPCPL prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 Pa. Stat. § 201-3. The statute prohibits, in the "catchall provision," "fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding" in the conduct of trade or commerce. 73 Pa. Stat. § 201-2(4)(xxi). To state a plausible claim under the UTPCPL, a Complaint must allege that a plaintiff "(1) purchased or leased goods or services primarily for a personal, family, or household purpose; (2) suffered an ascertainable loss of money or property; and (3) the loss occurred as a result of the use or employment by a person of a method, act, or practice declared unlawful by the UTPCPL." Baynes v. George E. Mason Funeral Home, Inc., Civ. A. No. 09-153, 2011 WL 2181469, at *4 (W.D. Pa. June 2, 2011) (citing 73 Pa. Stat. § 201-9.2(a)).

Under the UTPCPL, a deceptive act is "'conduct that is likely to deceive a consumer acting reasonably under similar circumstances.'" Seldon v. Home Loan Servs., Inc., 647 F. Supp. 2d 451, 470 (E.D. Pa. Aug. 4, 2009) (quoting Black's Law Dictionary 455 (8th ed. 2004)). The Complaint must also allege that the plaintiffs justifiably relied on the defendant's alleged deceptive conduct. See Hunt v. U.S. Tobacco Co., 538 F.3d 217, 224 (3d Cir. 2008) (concluding that "plaintiffs alleging deceptive conduct under the . . . catchall provision must allege justifiable reliance"). In other words, the Complaint must allege that knowledge of the deceptive conduct "would have changed [Plaintiffs'] conduct." Id. at 227.

Ocwen argues that the Complaint does not allege a claim against it for violation of the UTPCPL based on Saxon's acts in deceiving Plaintiffs into believing that they would be offered permanent HAMP modifications upon successful completion of the TPP, illegally collecting late fees and penalties, and failing to provide the Commonwealth with the information it needed for

Plaintiffs to obtain a HEMAP loan. Plaintiffs concede that their UTPCPL claims that relate to their TPP are asserted against Ocwen only to the extent that Ocwen is Saxon's successor-in-interest. (Pls.' Mem. at 16.) We have already determined that the Complaint fails to state a plausible claim that Ocwen is Saxon's successor-in-interest, so, therefore, we conclude that Ocwen is not be liable for Saxon's alleged violations of the UTPCPL relating to Plaintiffs' TPP.

Plaintiffs also contend that the Complaint alleges that Ocwen independently violated the UTPCPL in three ways: first, Ocwen's In-House Modification contained a deceptive balloon payment provision; second, the terms of the In-House Modification violate federal law; and third, Ocwen improperly charged interest and fees after it began servicing Plaintiffs' loan. The Complaint alleges that Ocwen's In-House Modification failed to estimate the amount of Plaintiffs' final balloon payment and contained language that made it difficult to calculate the amount that would be due. (Compl. ¶ 70.) Ocwen argues that the Complaint fails to state a UTPCPL claim in connection with the In-House Modification because: (1) the terms of the In-House Modification were apparent on the face of the agreement; (2) Plaintiffs could have inquired about the terms if they were confused; and (3) the terms do not constitute deceptive conduct under the UTPCPL.

Balloon terms in loan agreements have been found to constitute prohibited conduct under the UTPCPL where the borrower was not notified that executing the note could result in a large balloon payment and the note did not disclose or estimate the amount of the lump sum payment. See In re Barker, 251 B.R. 250, 261-62 (Bankr. E.D. Pa. 2000). Balloon terms have been found not to violate the UTPCPL where the amount of the balloon payment was clearly stated in the mortgage and balloon note. See In re Fisher, 320 B.R. 52, 58, 71 (E.D. Pa. 2005).

16

The Complaint alleges that the Balloon Disclosure provided by Ocwen to Plaintiffs does not provide an estimate of the amount of the balloon payment, an explanation of how this payment will be calculated, or an amortization schedule for Plaintiffs' payments. (Compl. ¶ 70.) The Complaint's allegation that Ocwen failed to provide this information to Plaintiffs in easily understandable language and figures is sufficient to allege deceptive conduct, see In re Barker, 251 B.R. at 258-59, 261-62, because it would likely "deceive a consumer acting reasonably" into agreeing to a loan modification with a potentially unreasonable or unpredictable balloon payment. Seldon, 647 F. Supp. 2d at 470. Therefore, the Complaint adequately pleads facts alleging that Ocwen committed a deceptive act prohibited by the UTPCPL.[9]

Plaintiffs also assert that the Complaint alleges that Ocwen violated the UTPCPL by offering terms in its In-House Modification that violate the FDCPA. (Compl. ¶¶ 123-30.) A plaintiff "need only establish a viable claim under the FDCPA in order to state sufficient claims under the . . . UTPCPL." Stuart v. AR Res., Inc., Civ. A. No. 10-3520, 2011 WL 904167, at *5 (E.D. Pa. Mar. 16, 2011). We have already concluded that the Complaint alleges sufficient facts to state a claim for violation of the FDCPA. Therefore, the Complaint adequately alleges a claim against Ocwen for violation of the UTPCPL based on Ocwen's violation of the FDCPA.

---

[9]Ocwen also argues that it did not violate the UTPCPL merely by offering terms in its In-House Modification that were "inferior" to the terms of Plaintiffs' TPP. The Complaint alleges that "Ocwen offered [Plaintiffs] an in-house modification on terms that were significantly inferior to the terms under the HAMP TPP" (Compl. ¶ 70), but does not explicitly allege that the terms, merely in comparison to those under Plaintiffs' TPP, "create[d] a likelihood of [Plaintiffs'] confusion or of misunderstanding" of their obligations under the In-House Modification, 73 Pa. Stat. § 201-2(4)(xxi). Unlike Ocwen, we do not read the Complaint to allege that the In-House Modification terms, merely by being inferior to those of Plaintiffs' TPP terms, violated the UTPCPL.

Plaintiffs further assert that Ocwen violated the UTPCPL by charging increased interest and fees on their loan after it was transferred from Saxon. Plaintiffs base their arguments not on any factual allegations in the Complaint, but on documents attached to their Memorandum. Extrinsic exhibits may be considered on a motion to dismiss if the exhibits are "referred to in the plaintiff's complaint and are central to the claim," Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 560 (3d Cir. 2002) (quotation omitted), that is, if the exhibits are "integral to or explicitly relied upon in the complaint." Jones v. Middletown Twp., 253 F. App'x 184, 187 (3d Cir. 2007) (citation omitted). The documents attached to Plaintiffs' Memorandum are not "referred to in the [Complaint]," Pryor, 288 F.3d at 560, because the Complaint fails to describe any facts related to the alleged additional charges to Plaintiffs' mortgage after it was transferred. For the same reasons, these documents are not "integral" nor "explicitly relied upon" in the Complaint. Jones, 253 F. App'x at 187. At this time, it would be improper to consider the exhibits attached to Plaintiffs' Memorandum, and therefore we conclude that the Complaint fails to allege plausible facts supporting Plaintiffs' claim that Ocwen committed a deceptive act by improperly charging additional fees after Plaintiffs' loan servicing was transferred from Saxon.

Ocwen also argues that the Complaint's allegations of Ocwen's independent violations of the UTPCPL should be dismissed because the Complaint does not allege justifiable reliance.[10] The Complaint alleges that Plaintiffs suffered monetary losses "as a result of" Defendants'

---

[10]Ocwen also argues that the Complaint does not allege ascertainable loss independent of Plaintiffs' claims against Saxon. Because we conclude that the Complaint fails to allege justifiable reliance, we need not consider Ocwen's argument with respect to ascertainable loss.

actions.[11]  (Compl. ¶ 112.)  However, the Complaint does not allege that Plaintiffs would not have signed the In-House Agreement had Ocwen provided, for example, an estimate of Plaintiffs' balloon payment.  See Hunt, 538 F.3d at 227.  Rather, the Complaint alleges that Plaintiffs agreed to the In-House Modification "[b]ecause they were fearful of losing their [home] to foreclosure."  (Compl. ¶ 71.)  The Complaint thus fails to allege justifiable reliance on Ocwen's failure to disclose important information in its In-House Modification.  For all of these reasons, the Complaint fails to state a claim for violation of the UTPCPL, and accordingly, we grant Ocwen's Motion as to Plaintiffs' UTPCPL claim.[12]

## IV.    CONCLUSION

For the foregoing reasons, Ocwen's Motion to Dismiss is granted in part and denied in part.  The Motion is granted as to Count I (Breach of Contract and Breach of the Implied Duty of Good Faith and Fair Dealing), Count II (Promissory Estoppel), Count III (Violation of the FCEUA), and Count III (Violation of the UTPCPL); and is denied as to Count IV (Violation of the FDCPA).  Plaintiffs' request for leave to amend the Complaint is denied.  An appropriate order follows.

BY THE COURT:

/s/ John R. Padova

_____

John R. Padova, J.

---

[11]This allegation merely mirrors the statutory language.  See 73 Pa. Stat. § 201-9.2(a). "A formulaic recitation of the elements of a cause of action" cannot survive a Rule 12(b)(6) motion.  Phillips, 515 F.3d at 231 (citing Twombly, 550 U.S. at 555).  Therefore, this allegation alone is insufficient to adequately allege justifiable reliance.

[12]Because the Complaint explicitly alleges that Plaintiffs signed the In-House Modification because their home was in foreclosure, we conclude that any curative amendment with respect to alleging justifiable reliance would be futile.  Phillips, 515 F.3d at 245.