IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LISA and SCOTT CAVE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAXON MORTGAGE SERVICES, INC.,<br><br>Defendant. | Civ. A. No. 11-4586 |
| WILLIAM D. CAVE, on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SAXON MORTGAGE SERVICES, INC.,<br><br>Defendant. | Civ. A. No. 12-5366 |

**MEMORANDUM**

**Padova, J.**                                                                                           **October  19, 2015**

Presently before the Court is a Motion by Plaintiffs to exclude the Report of Defendant Saxon Mortgage Services, Inc.'s expert witness Marsha J. Courchane, Ph.D. (the "Courchane Report"[1]).  Plaintiffs argue that certain of Dr. Courchane's opinions, offered in rebuttal to the Report provided by Plaintiffs' expert Dr. Ian Ayers in support of Plaintiffs' Motion for Class

---

[1] See Def. Opp. To Mot. to Exclude Ex. A, October 13, 2014 Expert Report of Marsha J. Courchane, Ph.D.

Certification ("the Ayers Report"[2]), must be excluded because she has improperly offered a legal opinion on the interpretation of the Temporary Payment Plan ("TPP") contracts under the federal Home Affordable Mortgage Program ("HAMP") that form the basis of Plaintiffs' claims, the parties obligations under those contracts, and whether the parties have breached their contracts while opining on class certification issues.[3]  For the reasons that follow, we grant the Motion in part.[4]

---

[2] See Pls.' Mot. for Class Cert., Ex. 28, Aug. 25, 2014 Class Cert. Rpt. Of Ian Ayers.

[3] In Civ. A. No. 11-4586 ("Cave I"), Plaintiffs Lisa and Scott Cave seek certification of a class consisting of all Pennsylvania homeowners with home mortgage loans serviced by Saxon, who, since April 13, 2009, have entered into TPP contracts, made all payments required by their TPPs on time, complied with Defendant's requests for financial documentation, and either (a) have not received a permanent HAMP modification or a timely written notification of denial (the "Denied Class"); (b) were improperly reported to credit reporting agencies as delinquent (the "Credit Reporting Class"); or (c) were improperly placed in foreclosure and/or charged for various foreclosure related fees (the "Foreclosure Class").  (Docket Entry 90 ¶ 2.)

In Civ. A. No. 12-5366 ("Cave II"), Plaintiff William Cave seeks certification of classes with the same definitions as the Cave I Denied Class (the "Cave II Pennsylvania Class"), Credit Reporting Class, and Foreclosure Class.  He also seeks to certify an additional "Multistate Class" that includes:  all borrowers in Arizona, Hawaii, Idaho, Illinois, Indiana, Maine, Massachusetts, Montana, Nevada, Oregon, Pennsylvania, Rhode Island, Washington, and Wisconsin, whose loans have been serviced by Saxon and who, during the period between April 2009 and October 2009, (i) received TPPs from Saxon that are substantially similar to Plaintiff's TPP and that Saxon counter-signed and returned to the borrowers, (ii) made all monthly payments as required by their TPPs, and (iii) did not receive a permanent HAMP modification by the Modification Effective Date ("MED") set forth in their TPPs.  The Multistate Class does not include any borrowers as to whom, on or before the MED set forth in their TPPs, Saxon determined that the borrowers no longer resided in the property identified in the TPPs as their principal residence, or that the property had been condemned, or that the borrowers failed to obtain credit counseling required by Treasury, or that the borrowers had paid off their mortgages.  (Docket Entry 57-4 at ¶ 2.)

[4] At oral argument of the Motion, Plaintiffs argued alternatively that Paragraphs 13, 15-17, 19, 21, 43-50, 53, 55, 58, and 97-98 of the Courchane Report be stricken, rather than the entire report.  (N.T. Aug. 25, 2015 at 10-11.)  Plaintiffs have also designated pages to be stricken from Dr. Courchane's deposition.  Because we conclude that Dr. Courchane's opinions may be relevant to at least one of the proposed classes, even if they do not apply to others, we limit our focus to the numbered paragraphs designated by Plaintiffs.  Additionally, we note that neither

(Footnote Continued on Next Page.)

I.     **STANDARD OF REVIEW**

The United States Court of Appeals for the Third Circuit has recently joined "certain of our sister courts to hold that a plaintiff cannot rely on challenged expert testimony, when critical to class certification, to demonstrate conformity with [Federal Rule of Civil Procedure] 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in Daubert [v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993)]." In re Blood Reagents Antitrust Litig., 783 F.3d 183, 187 (3d Cir. 2015). The Court held that expert testimony "that is insufficiently reliable to satisfy the Daubert standard cannot 'prove' that the Rule 23(a) prerequisites have been met 'in fact,' nor can it establish 'through evidentiary proof' that Rule 23(b) is satisfied." Id.

The Daubert analysis governing the admissibility of expert testimony has been codified in Federal Rule of Evidence 702, which provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The proponent of the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999) (citing Daubert, 509 U.S. at 592 n.10 (1993)); see also Mahmood v. Narciso, 549 F. App'x 99, 102 (3d Cir. 2013) (citing In re TMI Litig., 193 F.3d 613, 663 (3d Cir. 1999)).

---

(Footnote Continued from Previous Page.)

party has offered Dr. Courchane's deposition as part of the class certification record. Accordingly, we do not reach the deposition designations.

There are three requirements for the admissibility of expert testimony pursuant to Rule 702, "'qualification, reliability and fit.'"[5]  Calhoun v. Yamaha Motor Corp., U.S.A., 350 F.3d 316, 321 (3d Cir. 2003) (quoting Schneider v. Fried, 320 F.3d 396, 405 (3d Cir. 2003)).  "Fit" means that "'the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact.'"  Id. (quoting Schneider, 320 F.3d at 405).  It pertains "'primarily to relevance.'"  Meadows v. Anchor Longwall & Rebuild, Inc., 306 F. App'x 781, 790 (3d Cir. 2009) (quoting Lauria v. Nat'l R.R. Passenger Corp., 145 F.3d 593, 599 (3d Cir. 1998)).  "The expert's testimony must 'fit' under the facts of the case so that 'it will aid the jury in resolving a factual dispute.'"  Id. (quoting Lauria, 145 F.3d at 599).  This element "'requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.'"  Id. (quoting Lauria, 145 F.3d at 600).  "In other words, expert testimony based on assumptions lacking factual foundation in the record is properly excluded."  Id. (citing Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 414 (3d Cir. 2002)).

**II.   DISCUSSION**

    a.   Background: the Court's prior legal rulings and Dr. Courchane's opinions.

In deciding Saxon's earlier motions to dismiss the Cave I and Cave II complaints, we determined that the Plaintiffs had plausibly alleged breach of contract claims based upon the allegation that Saxon's countersigning a borrowers' TPP (1) constituted a determination that the borrower qualified for a HAMP modification, and (2) created a binding obligation to make the modification subject to two conditions precedent.  Construing the agreements, we held, *inter alia*:

---

[5] Plaintiffs raise no objection to Dr. Courchane's qualifications to offer her expert opinion
(Footnote Continued on Next Page.)

The conditions precedent to Saxon's obligation to provide Plaintiffs with permanent modifications are therefore twofold: (1) Plaintiffs' timely trial period payments, and (2) the continued validity of Plaintiffs' representations regarding their financial conditions and the conditions of their properties. By signing their TPPs and returning them to Saxon, Plaintiffs represented that they understood that: "[Saxon] will send me a signed copy of this Plan, if I qualify for the Offer, or will send me written notice that I do not qualify for the Offer."[6]

[A] mortgage servicer is required to make a determination regarding a borrower's qualifications for a modification under HAMP regulations upon receipt of the signed TPP, and that the servicer's return of an executed TPP to the borrower is a communication that the borrower is, in fact, qualified.[7]

[T]he TPP obligated Saxon, after it returned the executed TPPs to Plaintiffs, to provide Plaintiffs with permanent modifications as long as they "compl[ied] with the requirements in Section 2 and [their] representations in Section 1 continue[d] to be true in all material respects" – in other words, as long as they made all of their trial payments on time and their financial information continued to be true and accurate.[8]

Saxon also argues that it did not breach the TPP by refusing to give Plaintiffs permanent modifications, because it determined upon further review of Plaintiffs' documentation that they were not qualified for permanent modifications, and it

---

(Footnote Continued from Previous Page.)

or to the reliability of the methods she employs.

[6] Cave II, Civ. A. No. 12-5366, 2013 WL 1915660, at *5 (E.D. Pa. May 9, 2013) (quoting TPP Introduction).  Accord Cave I, Civ. A. No. 11-4586, 2012 WL 1957588, at *5 (E.D. Pa. May 30, 2012) ("We therefore conclude that the TPP contains a clear promise that Saxon will provide Plaintiffs with a permanent modification if several conditions precedent are met.  However, it is clear that Saxon was only obligated to provide a permanent modification if Plaintiffs qualified.")

[7] Cave II, 2013 WL 1915660, at *6 (following Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 562 (7th Cir. 2012)).  See also Cave I, 2012 WL 1957588, at *4 n.6 (noting without determining that "Plaintiffs argue in the alternative that, by the terms of the TPP, whether they qualified for permanent modification was determined before they entered into the TPP, and that by sending Plaintiffs a signed copy of the TPP, Saxon necessarily had already determined that Plaintiffs qualified for permanent modification.  This is how the Seventh Circuit interpreted the TPP at issue in Wigod, 673 F.3d at 563.")

[8] Cave II, 2013 WL 1915660, at *6 (quoting TPP § 3).  Accord Cave I, 2012 WL 1957588, at *4 ("Later in the TPP, this apparent promise [contained in the introductory sentence of the TPP] to provide a permanent modification is conditioned on whether Plaintiffs qualified for permanent modification. . . . ")

>was entitled to conduct that further review pursuant to the TPP requirement that, for Plaintiffs to secure permanent modifications, their financial representations had to continue to be true and accurate.  However, we do not read the provision regarding continuing financial representations to permit Saxon to revisit its prior qualification decision based on a new assessment of previously submitted data.  Moreover, contrary to Saxon's assertion, the Complaint alleges that Plaintiffs not only made all of their trial payments on time, but also performed all of their other obligations under their TPPs…. We therefore reject Saxon's argument that the Complaint fails to state a valid claim of breach of contract because it was entitled under the TPP to deny permanent modifications to Plaintiffs upon reassessment of its prior qualification decision.[9]
>
>In sum, we conclude that Saxon's theory that the TPP permitted it to determine whether Plaintiffs qualified under HAMP guidelines "after the trial period began . . . conflicts with the plain terms of the TPP."[10]

We find that Dr. Courchane's opinions, offered to rebut the Ayers Report, fail to meet the Daubert standard in key regards because she incorporates a misinterpretation of the duties and obligations we have determined are contained in certain class members' TPPs.  Unfortunately, because the definitions of the various classes proposed by Plaintiffs are not identical, any decision we make concerning whether Dr. Courchane's opinions "fit" with the proposed class definitions is complicated by the fact that neither Dr. Ayers nor Dr. Courchane differentiate between the various class definitions when offering their opinions.  Our negative determination on the fit of Dr. Courchane's opinions regarding her discussion of actual eligibility for a

---

[9] Cave II, 2013 WL 1915660, at *6 n. 6.  See also Cave I, 2012 WL 1957588, at *5 ("We reject Saxon's interpretation of [TPP Sections 2.F and 2.G].  First, these provisions, rather than giving Saxon unfettered discretion as to its obligations under the TPP, simply set forth reasons why the permanent modification would not occur automatically upon the expiration of the three-month trial period. . . .  Second, Saxon's interpretation contradicts other provisions in the TPP that unequivocally state that Saxon will provide a permanent modification if Plaintiffs qualify and other conditions are met.")

[10] Cave II, 2013 WL 1915660, at *6 (deletion in original).  See also Cave I, 2012 WL 1957588, at *7 ("Accordingly, we conclude that the TPP is an enforceable contract.  Under its plain terms, the TPP obligated Saxon to provide Plaintiffs with a permanent loan modification if Plaintiffs qualified, or send Plaintiffs a written denial if they did not qualify.")

permanent modification is limited to the Cave I classes and their corresponding identically defined Cave II classes. The Cave II Multistate Class, whose definition requires that its members were actually entitled to a permanent modification, must be differentiated.

In her response to the Ayers Report, Dr. Courchane endeavors to determine "whether a common data analysis method can be applied to the available electronic data to reliably identify members of the classes proposed by Plaintiffs." (Courchane Report ¶ 7.) She also provides a response to Dr. Ayers' proposed approach to ascertaining the class and calculating class-wide damages.[11] (Id. ¶ 8.) In so doing, we find that Dr. Courchane contradicts our legal rulings in two

---

[11] We note that, while Saxon raised assertions at oral argument that Dr. Ayers failed to offer a methodology and data to support certain of his opinions (see N.T. Aug. 25, 2015 at 15), Saxon has not filed a formal Daubert motion. Accordingly, we express no opinion at this time about the admissibility of the Ayers Report.

To place the instant discussion in context, we only note that Dr. Ayers has opined that "individuals who were affected by [Saxon's] alleged conduct can be identified using evidence and methods that are common to the Class." (Ayers Report ¶ 12.) He opines that:

- Saxon maintains sufficient data concerning its customers to allow identification of Class members and permit class-wide examination of Saxon's conduct. (Id.)

- Class membership can be ascertained using information contained in Saxon's electronic records. (Id. ¶ 13.)

- Such method is common to the Class because none of this evidence and analysis depends upon an individualized inquiry into Class members. (Id. ¶ 15.)

- Under HAMP guidelines, the servicer would already have deemed the homeowner initially eligible for a modification as a condition of offering them a TPP. Once the TPP was provided, the servicer had a defined period of time during the trial in which to verify the information initially provided by the homeowner. If the verified financial information differed from initially reported information, eligibility would have to be retested. (Id. ¶ 35.)

- Only after this confirmation and receipt of the borrower's first monthly trial period payment would servicers execute the TPP and return it to the borrower. (Id. ¶ 36.)

(Footnote Continued on Next Page.)

(Footnote Continued from Previous Page.)

- Servicers did not have an unlimited period of time to verify the initial information. In every TPP, the "trial period" is a defined term that ends on the MED. If a servicer believed a borrower did not qualify for the modification by the time of the MED — by not making all payments or submitting required documentation — the servicer was required to notify the borrower if the process was terminated. (Id. ¶ 40.)

- Treasury required participating servicers to submit data reports concerning HAMP applicants, including trial setup data, trial cancellation data, trial payment data, and permanent modification data. This included borrower identity, results of eligibility tests, and the MED. (Id. ¶ 46.)

- If the TPP became a permanent modification, servicers had to report information about the official modification the month the modification became effective. (Id. ¶ 47.)

- Saxon maintained an internal database called FiServ and an internal decision engine called TriCalc to process loan and borrower information under HAMP and determine eligibility. (Id. ¶¶ 54-56.)

- Saxon's corporate representative produced a spreadsheet using Saxon internal data and Treasury data to identify loans processed under HAMP that met each of the following aspects of the Class definition: (1) borrowers in one of the fourteen states within the Multistate Class; (2) borrowers who were placed into TPPs by Saxon; (3) borrowers who made their first trial payment; (4) borrowers who were denied a permanent modification; (5) borrowers whose reason for denial as coded in the Treasury data was any reason except defaulting on their trial payments; and (6) borrowers whose properties were owner-occupied. Saxon's own analysis suggests a large class of HAMP applications where Saxon failed to fulfill its duty to make a timely eligibility determination. (Id. ¶ 59.)

- Using this data, Dr. Ayers is able to ascertain membership in the Class by identifying borrowers located in a state included in the class definition, with a TPP during the relevant period, who made TPP payments on time, as well as the outcome of the borrower's TPP (i.e., a timely approval, a late approval, a timely denial, a late denial, or no denial at all). (Id. ¶ 61.)

- Using this data, Dr. Ayers opines that he is able to determine commonality and typicality and that William Cave and Lisa and Scott Cave can be identified as class members. (Id. ¶¶ 75, 77.)

- He opines that the present value of damages to Lisa and Scott Cave is $38,053.48 as of May 16, 2011, the date of their loan's service release; the present value of

(Footnote Continued on Next Page.)

interrelated respects.  First, while we held that Saxon's countersigning the named Plaintiffs' TPP created a binding obligation (subject to two conditions precedent) to provide the permanent modification or issue a timely denial notice, Dr. Courchane disregards this ruling.  Second, while the TPP itself provides for a "Modification Effective Date," by which Saxon was required to issue a denial or provide the permanent modification, Dr. Courchane relies upon parol evidence in concluding that the Modification Effective Date means something other than what it unambiguously states.

      b.      Dr. Courchane's treatment of the TPP's binding obligations.

In her rebuttal to Dr. Ayers' opinion that Class membership may be ascertained using the common evidence of Saxon's internal data and governmental submissions, Dr. Courchane opines that the Class is not ascertainable from this data because:

> even if all payments are made on time and all document requests are met in a timely manner, [this] does not guarantee that a borrower will automatically receive a permanent modification.  There are clear circumstances for which permanent modifications would not result.  Borrowers are assured a permanent modification only if, among other things, their verbal representations can be confirmed by the documentation provided and only if circumstances do not materially change over the trial period.

(Courchane Report ¶ 13.)  She continues that the:

> alleged failures to convert borrowers with TPPs to permanent modifications, or delays in those conversions, could be attributable to extensions provided by the Treasury for certain HAMP participants; failures or delays on the part of either the borrower or Saxon (or a combination of the two); inaccuracies, deficiencies or ambiguities in borrowers' document submissions; changes in borrower's financial circumstances, or any number of other individualized factors

---

(Footnote Continued from Previous Page.)

>> damages to William Cave is $5,820.26 as of April 16, 2010, the date of his loan's service release.  (Id. ¶ 86.)

for which available electronic data would not work as common evidence. (Id. ¶ 15 (parenthetical in original).) She also states that "a putative class member's submission of a signed TPP and submission of documentation required by Treasury for the purpose of evaluating HAMP eligibility are not sufficient bases for concluding that the class member actually qualified for a permanent modification." (Id. ¶ 17.[12]) We find that these statements fail the Daubert fit test insofar as they are intended to apply to the Cave I and similarly defined Cave II classes.

First, membership in all of the proposed classes is not based upon "a putative class member's submission of a signed TPP," but rather upon Saxon's countersigning the TPP, indicating that the borrower qualified for the program and would receive a modification so long as he or she satisfied the conditions precedent. We determined for the named Plaintiffs that a binding agreement was created when Saxon countersigned the TPP, subject only to those conditions precedent to Saxon's duty to perform. Cave II, 2013 WL 1915660, at *6 (stating that "a mortgage servicer is required to make a determination regarding a borrower's qualifications for a modification under HAMP regulations upon receipt of the signed TPP, and that the servicer's return of an executed TPP to the borrower is a communication that the borrower is, in fact, qualified"). With the exception of the Multistate Class, Dr. Courchane's focus on the

---

[12] Dr. Courchane states a number of other opinions criticizing Dr. Ayers based on his asserted failure to consider the "actual eligibility" of class members in reaching his opinion on ascertainability. (See Courchane Report ¶ 43-46.) She opines, *inter alia*, that "the fact that a borrower received a TPP did not necessarily mean that the borrower was actually eligible for a permanent HAMP modification" (id. ¶ 43); circumstances arising after Saxon's countersigning the TPP "could result in a loan servicer finding a borrower to be ineligible. . . even though the borrower may have been approved for a TPP and made all of their trial payments on a timely basis" (id. ¶ 44); actual eligibility could only be determined "after information was verified through documentation submitted by borrowers . . ." (id. ¶ 45); and that putative class members "generally would have received TPPs . . . based on a preliminary eligibility evaluation that relied on unverified representations. . . . Evaluations of putative class members by Saxon for permanent HAMP loan modifications were dependent upon actions by the borrowers subsequent to the initiation of their TPPs." (Id. ¶ 46.) Our discussion applies to these Paragraphs as well.

borrower's subsequent duty to provide accurate information and prove their actual eligibility for a permanent modification ignores the class definitions proposed by Plaintiffs. The Cave I Denied Class and the Cave II Pennsylvania Class are not comprised of persons who were actually eligible for a HAMP modification; they are composed of persons who were put into a TPP but never received a permanent HAMP modification **or** a timely written notification of denial. Membership in the Credit Reporting Class and the Foreclosure Class also does not depend upon actual eligibility for a permanent modification. If a class member failed to provide accurate information, was ineligible for a permanent modification, or the information submitted was delayed, deficient or ambiguous, it was incumbent upon Saxon under the terms of the signed TPP to issue a notice of denial within the time period specified. Dr. Courchane's opinion treats the condition precedent that the borrower supply accurate information as a reason to find that they are not members of the class, when satisfying those conditions precedent are not part of the class definition. Furthermore, this interpretation of the TPP contradicts the exchange of enforceable promises that the contracts contain because it improperly shifts the responsibility from Saxon to the borrower for the consequences of Saxon's failure to communicate a timely decision on a permanent modification. This interpretation is clearly found in Dr. Courchane's opinion that "[e]valuations of putative class members by Saxon for permanent HAMP loan modifications were dependent upon actions by the borrowers subsequent to the initiation of their TPPs" (Courchane Report ¶ 46), and when she further opines that "[w]hen a borrower fails to supply to their loan servicer all of the required documentation, and to do so on a timely basis, delays are introduced into the evaluation process, and can result in a Modification Effective Date beyond the anticipated MED contemplated in a borrower's TPP." (Id. ¶ 47.)

Because Dr. Courchane's opinions in Paragraphs 13, 15, 17, 46 and 47 of the Report misconstrue the condition precedent that the borrower supply accurate information into a method by which Saxon could exercise unfettered discretion on its obligations under the TPP, we find that these Paragraphs fail the Daubert fit test as all proposed classes save the Cave II Multistate Class.

Likewise, Paragraph 16 of the Report fails the fit test for these same classes. Dr. Courchane opines that Dr. Ayers has failed to provide a method for systematically identifying whether any of the putative class members actually qualified for a permanent HAMP modification based on verifiable information. Dr. Courchane's insistence that the requirement of actual eligibility for the modification renders the class unascertainable is mostly irrelevant, since membership in the proposed classes, other than the Cave II Multistate Class, does not depend upon actual eligibility. It relies upon whether Saxon provided a timely eligibility decision. Even borrowers that were ultimately deemed ineligible for a permanent modification can be members of the Denied Class and the Pennsylvania Class if Saxon failed to inform them of that fact on a timely basis; if they were eligible, by definition they did not receive the modification to which they were entitled.

        c.        Dr. Courchane's treatment of the Modified Effective Date provision.

Dr. Courchane's opinions regarding the MED term applicable to the Cave I Denied Class, the Cave II Pennsylvania Class and Multistate Class are also improper.[13] Dr. Courchane opines that Dr. Ayers erroneously assumed "that the Modification Effective Date for each TPP was

---

[13] The definitions of the Credit Reporting Classes or the Foreclosure Classes do not explicitly incorporate a timeliness element. Accordingly, our discussion of Dr. Courchane's treatment of the MED term do not apply to those classes.

three or four months after the trial period began ('Trial MED'), which may well not have been the case." (Report ¶ 16.) She also opines that Dr. Ayers "did not offer a reliable method for determining the Modification Effective Date applicable to each putative class member. (Id. ¶ 21; see also ¶ 47 ("When a borrower fails to supply to their loan servicer all of the required documentation, and to do so on a timely basis, delays are introduced into the evaluation process, and can result in a Modification Effective Date beyond the anticipated MED contemplated in a borrower's TPP."); ¶¶ 48-50 (further discussing the effect of delays in a borrower providing information); ¶ 53 (criticizing Dr. Ayers for assuming that the "operative MED for all potential class members is necessarily established and fixed by the anticipated MED"); ¶ 55 (asserting the "MED is legitimately subject to change"; thus Dr. Ayers' "approach would tend to incorrectly inflate the number of class members"); ¶ 58 (criticizing Dr. Ayers' failure to address extensions to anticipated MEDs).) In so doing, she relied upon concepts — namely, the "anticipated" MED and the "official" MED — that are not contained in the TPP. She improperly opines that the MED actually contained in the TPP is only the *anticipated* Modification Effective Date of the official loan modification, subject to Treasury guidelines and requirements, while the "Official MED is the actual Modification Effective Date of an official loan modification, if one is issued." (Id. ¶ 16.[14])

---

[14] Dr. Courchane states:

> Dr. Ayers assumes that the MED for each TPP was three or four months after the trial period began ("Trial MED"), which may well not have been the case. The Trial MED is the anticipated MED of the official loan modification, subject to Treasury guidelines and requirements. The Official MED is the actual Modification Effective Date of an official loan modification, if one is issued. Clearly, Treasury anticipated some differences between the anticipated (*ex ante*) and actual or official (*ex post*) MED dates.

(Footnote Continued on Next Page.)

The Plaintiffs' TPPs all state in pertinent part:

During the period (the "Trial Period") commencing on the Trial Period Effective Date and ending on the earlier of: (i) the first day of the month following the month in which the last Trial Period Payment is due (the "Modification Effective Date") or (ii) termination of this Plan, I understand and acknowledge that:

…

F.   If prior to the Modification Effective Date (i) the Lender does not provide me a fully executed copy of this Plan and the Modification Agreement; (ii) I have not made the Trial Period payments required under Section 2 of this Plan; or (iii) the Lender determines that my representations in Section 1 are no longer true and correct, the Loan Documents will not be modified and this Plan will terminate.

(Ex. D, § 2.)  In his Report, Dr. Ayers asserts that class members can be identified through common evidence and methods because borrowers who did not receive (1) a timely permanent modification or (2) notice that they were ineligible for a permanent modification could be determined using data Saxon reported to Treasury.  (See Ayers Report ¶¶ 70-74.)  He relies in part upon the fact that, under the terms of the TPP:

Servicers did not have an unlimited period of time to verify the initial information used to qualify a borrower for HAMP.  In every TPP, the "trial period" is a defined term that ends on the MED.  If servicers such as Saxon believed the borrower had not qualified for the modification by the time of the MED, including, for example, by not making the required TPP payments or submitting the required documentation, then the servicer must notify the borrower if the modification process is terminated.

(Ayers Report ¶ 40.[15])

---

(Footnote Continued from Previous Page.)

(Report ¶ 16.)  She goes on to states that, since "[e]valuations of putative class members by Saxon for permanent HAMP loan modifications were dependent upon actions by the borrowers subsequent to the initiation of their TPPs . . . delays are introduced into the evaluation process, and can result in a Modification Effective Date beyond the anticipated MED contemplated in a borrower's TPP."  (Id. ¶¶ 46-47.)

[15] Dr. Ayers notes, for example, that Saxon's corporate representative testified that Saxon did not issue any modification denials until March 2010; therefore, "no borrower with a TPP

(Footnote Continued on Next Page.)

We find the criticisms leveled in Paragraphs 16, 21, 53, 55, and 58 of the Courchane Report based on Dr. Ayers' use of the MED actually contained in the TPPs also fail the fit test. Dr. Courchane's attempt to distinguish between an anticipated MED and an official MED based upon parol evidence contained in Treasury's HAMP Data Dictionary is improper. The TPP itself unambiguously sets the date upon which Saxon was required to issue a permanent modification or terminate the Plan.[16]  Time of performance is an essential term to a contract to which there

---

(Footnote Continued from Previous Page.)

during the relevant Cave II Multistate Class period of April 2009 to October 2009 would have received a timely denial before the borrower's MED." (Ayers Report ¶ 72.)  Dr. Ayers goes on to note that during the second half of 2009, Treasury issued several extensions to servicers to allow borrowers more time to submit the required documentation.  He opines that, "[e]ven if these Treasury-specified extensions are deemed valid by the Court, borrowers affected by the extension could be identified using Saxon's electronic data. . . .  Were the Court to find such trial extensions valid, the data associated with the transmission of those letters could be used to identify the relevant recipients and adjust the outcome accordingly."  (Id. ¶ 74.)

[16] We note a point of confusion in the record concerning the parties' positions on whether the MED provision is ambiguous.  At oral argument, Plaintiffs' counsel stated that whether Saxon's notice denying a permanent modification

> would be considered timely, it's an open question.  I think that's a question that doesn't even need to be resolved at class certification. . . .  Ayers considers the MED to be a deadline. . . .  With respect to the Cave I class, this Court ruled that it's not necessarily a deadline — sorry, the implied covenant of good faith and fair dealing does apply and, at least in the case of the Caves, 14 months after the start of the trial period was a breach of the duty of good faith and fair dealing.

(N.T. Aug. 25, 2015 at 39:13-40:3.)  Later, counsel stated:

> the good faith and fair dealing pertains to the Cave I class, which is a different document which has a different time is of the essence clause and if that pertains to the notification of a denial after the end of the trial period, with Cave II, we're not talking about good faith and fair dealing.  We're talking about a finite period of time.

(Id. 51:12-17.)

After oral argument on the Motion, Saxon submitted a response to Plaintiffs' designations of the Courchane Report paragraphs in which it asserts that "Plaintiffs concede that whether Saxon was timely in issuing a notice of denial is a question of fact determined under the reasonableness standard of the implied covenant of good faith and fair dealing." (Def. Resp. to

(Footnote Continued on Next Page.)

must be agreement for the contract to be binding.  See Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 585 (3d Cir. 2009).  Notably, the TPP itself declares in the same portion that contains the MED clause that "TIME IS OF THE ESSENCE under this Plan."  (Ex. D, § 2.)  Dr. Courchane's reference to parol evidence material outside the contract — Treasury's HAMP Data Dictionary — in an attempt to explain or vary the unambiguous terms contained therein is inappropriate.  Mellon Bank, N.A. v. Aetna Bus. Credit, Inc., 619 F.2d 1001, 1010 n.9 (3d Cir. 1980) ("If the written contract is unambiguous, the Parol Evidence Rule and the doctrines cited above bar the use of extrinsic evidence for interpretation.").  Accordingly, these portions of her Report fail to comport with Daubert.

       d.       Dr. Courchane's criticism of Dr. Ayers' failure to consider other factors.

In Paragraph 19 of the Report, Dr. Courchane lists eight factors Dr. Ayers failed to consider in reaching his ascertainability opinion:

1. which borrowers were denied without having received a TPP or were denied prior to having received a TPP;

---

(Footnote Continued from Previous Page.)

Pls' Designation at 5.)  Plaintiffs deny that they have made any such concession (see Pls' Reply to Def's Resp. at 3) and we do not read counsel's statement as a concession on the question of whether Saxon was obligated to issue a denial of the permanent modification by the MED.  The reference to good faith and fair dealing in our Cave I opinion concerned a separate Count of Plaintiffs' Complaint.  See Cave I, 2012 WL 1957588, at *8 ("Plaintiffs also assert that Saxon breach the implied covenant of good faith and fair dealing by acting in bad faith with respect to fulfilling its obligations under the TPP." . . .  We conclude that Plaintiffs have plausibly alleged that Saxon breached its implied duty to perform its TPP obligations in a diligent fashion by not informing them that they did not qualify for a permanent modification until over a year after Plaintiffs applied for a permanent modification, and months after actually determining that Plaintiffs did not qualify.")

2. which borrowers with a TPP provided all the information and documentation, and not just part of it, required by Treasury to evaluate their eligibility for a permanent HAMP modification, and when they provided it;

3. which borrowers provided income documentation that differed from the verbal representations of income they made when applying for a HAMP TPP;

4. which borrowers experienced changes in their financial circumstances between the time of their initial application and the completion of Saxon's review;

5. which borrowers received an extension to their TPPs, as required by Treasury directives or provided in their TPPs;

6. which borrowers had extended trial periods such as those due to the timing of their trial payments, the timing of their provision of required documents, their failure to submit required documents, or for other reasons;

7. the applicable Modification Effective Date for each borrower, and whether and why it may have been revised after the anticipated (Trial) MED stated in their TPP and subsequent to the initiation of the TPP;

8. the date(s) and form of notice provided to borrowers who were determined not to qualify for permanent modification.

We find Dr. Courchane's reliance on these eight factors fails the Daubert test.

The first factor fails the fit test for all classes since a borrower who never received a TPP, or was denied a modification prior to receiving a TPP, cannot be a class member.  The second, third, fourth and eighth factors fail the fit test for all classes other than the Multistate Class since a borrower who received a countersigned TPP but failed to submit all required documentation, whose stated income was not verified, whose financial condition changed, or who did not

otherwise qualify for a permanent modification, was still entitled to receive a timely denial notice based on that criterion. The fifth, sixth and seventh factors, which relate to "extensions" of the trial period beyond the MED stated in the TPP are rejected for all classes whose definition incorporates a timeliness requirement for the reasons detailed above concerning Dr. Courchane's treatment of the MED term.

      e.      Dr. Courchane's criticism of Dr. Ayers' assumption that a borrower would have received the modification stated in the TPP.

In Paragraphs 97-98 of the Courchane Report, Dr. Courchane faults Dr. Ayers for assuming in his damages methodology that "each class member would have been entitled to receive a permanent modification with the same terms as their individual TPP, if a permanent modification had been issued. This assumption may turn out to be true for some putative class members, but it cannot be assumed as a general rule." (Courchane Report ¶ 97.) She explains that, if the documentation submitted by a borrower after the TPP was countersigned indicated a change in financial circumstances, "HAMP guidelines would have required that the terms of any permanent modification be adjusted to reflect that verified information," and "it would have been appropriate for Saxon to revise the planned modification terms or eligibility determination accordingly." (Id. ¶ 98.) These opinions also fail the fit test. We have determined that a class member was entitled to a permanent modification if they satisfied the two conditions precedent. If a borrower's finances were not as represented, i.e., if he or she did not satisfy a condition precedent, Saxon's obligation was to deny the permanent modification by the MED. Other than the Multistate Class, by definition the classes contain no person for whom Saxon exercised that remedy. Accordingly, criticizing Dr. Ayers for making that assumption fails the fit test.

### III. CONCLUSION

We conclude that the Courchane Report paragraphs we have identified contain opinions that are contrary to our prior rulings. They are *per se* unreliable and inadmissible under Daubert. See United States v. Cunningham, 679 F.3d 355, 380 (6th Cir. 2012) (approving district court's exclusion of expert analysis that conflicted with the court's rulings and applicable law); Herbert v. Lisle Corp., 99 F.3d 1109, 1117 (Fed. Cir. 1996) (the "exercise of the trial court's gatekeeper authority [is encouraged] when parties proffer, through purported experts, not only unproven science… but *markedly incorrect law*. Incorrect statements of law are no more admissible through 'experts' than are falsifiable scientific theories."); Southard v. United Reg'l Health Care Sys., Inc., Civ. A. No. 7-06-11, 2008 WL 4489692, at *2 (N.D. Tex. Aug. 5, 2008) ("[W]here as here, the expert's opinion is based on an erroneous legal premise, it is appropriate to exclude such testimony"); Malletier v. Dooney & Burke, Inc., 525 F. Supp. 2d 558, 573 (S.D.N.Y. 2007) (excluding expert testimony where it did not fit within applicable substantive law); Loeffel Steel Prods. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 806 (N.D. Ill. 2005) ("Expert opinions that are contrary to law are inadmissible…. They cannot be said to be scientific, to be reliable, or to be helpful to the trier of fact."). See also Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp., 995 F.2d 425, 432 (3d Cir. 1993) (holding that defendants' evidence was properly excluded where it was contrary to the court's ruling on the type of damages available to plaintiffs). In making this finding, we have been careful to limit our purview to the face of the expert reports and only analyze how our prior legal holdings have been applied. The Court reserves to the full hearing of all class certification issues the final determination on admissibility and weight to be accorded to all expert and other testimony presented.

An appropriate Order will be entered.[17]

BY THE COURT:

_____
JOHN R. PADOVA, J.

---

[17] Also adjudicated in the Order is Defendant's Motion to Strike Ayers Errata (Civ. A. No. 11-4586 Docket Entry 127; Civ. A. No. 12-5366 Docket Entry 122.) Following his deposition, Dr. Ayers submitted an Errata Sheet and later an Amended Errata Sheet, correcting certain testimony concerning whether Cave I Plaintiffs Lisa Cave and Scott Cave had been damaged as part of the Cave II Multistate Class. Saxon objects that Dr. Ayers attempts to use the Errata Sheet to materially change his testimony on that subject. We note that Dr. Ayers stated in his deposition that he calculated Multistate Class damages for Lisa and Scott Cave "for illustrative purposes" and stated that "I don't have an opinion given their contract that there was a — that damages are appropriate for Lisa and Scott Cave." (Nov. 24, 2014 Ayers Dep. at 189:13-19.) In the Amended Errata Sheet he reiterated that he calculated these Plaintiffs' Multistate Class damages for illustrative purposes and stated "Although I do not express an opinion on the quantification of damages for Cave I Class members, it is my opinion that the untimely denial notification was a breach of contract and that Lisa and Scott Cave were harmed and damaged by the breach." (Ayers Amended Errata Sheet at 3.) He explained that the reason for the change was that his "testimony requires clarification to correct inaccuracies and potential misconceptions from my initial responses. (Id.)

Federal Rule of Civil Procedure 30(e) provides a method by which a deponent may correct the form or substance of his or her deposition. Under the Rule, the deponent must request an opportunity to make corrections before the deposition is completed, those corrections must be submitted within 30 days after the court reporter has completed the deposition, and the deponent must state an adequate reason for the changes. EBC Inc. v. Clark Building Systems, Inc., 618 F.3d 253, 265 (3d Cir. 2010). As Dr. Ayers stated an adequate reason for the change to his testimony, and there is no assertion that he failed to comply with the other requirements of Rule 30(e), the Motion to strike is denied.